**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| Lance Miller and Seth Freeman as Co-Trustees of the iCap Trust, <br><br> Plaintiffs, <br><br> v. <br><br> Columbia Bank f/k/a Umpqua Bank, <br><br> Defendant. | Civil Action No. <br><br> **COMPLAINT** <br><br> **JURY DEMANDED** |

COMPLAINT

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

**Table of Contents**

PRELIMINARY STATEMENT ...........................................................................1

THE PARTIES.................................................................................................7

JURISDICTION AND VENUE .........................................................................8

FACTUAL BACKGROUND .............................................................................8

    A.    History of the iCap Entities...........................................................8

    B.    The Christensens Controlled the iCap Entities  and Were Fiduciaries to the Investors ...........................................9

    C.    The iCap Entities' Operations Bore All The Hallmarks of a Ponzi Scheme ..............................................................13

        i.    The Vast Majority of the iCap Entities' Deposits Came From Investors and Intercompany Transfers, Not Business Operations .14

        ii.    The Vast Majority of Withdrawals Were To Pay Investors  and Make Intercompany Transfers, Not to Fund Investments .............14

        iii.    The iCap Entities' Real Estate Business  Operations Produced Little Earnings.................................................15

        iv.    The iCap Entities Were Unable to Generate Sufficient  Revenue to Meet Their Obligations to Investors ...............................15

        v.    Intercompany Transfers and Commingling of Funds ....................17

        vi.    Unrealistic Returns Were Required for iCap to  Make Its Promised Payments to Investors .........................................19

        vii.    Other Hallmarks of the iCap Entities' Ponzi Scheme....................23

            a.    iCap Failed to Invest  Investors' Funds in Promised Investments ...........................................23

            b.    Later Investors Received Lower Returns  Than Those Received By Earlier Investors .........................................24

        viii.    As the Ponzi Scheme Collapses, the iCap Entities  Seek Bankruptcy Protection .................................................25

    D.    In Breach of His Fiduciary Duties, Chris Christensen Converted Investor Funds...........................................26

    E.    Umpqua's Role in the Scheme.......................................27

        i.    The iCap Entities Were a Major Client of Umpqua's Issaquah Branch.............................................27

        ii.    Umpqua Paid Close Attention to iCap, Was Familiar  With the Nature of its Business and Accounts, and  Appropriately Categorized iCap as "High Risk" ..................................29

            a.    Umpqua's Obligations to Monitor for Fraud.....................29

            b.    Umpqua Categorized iCap as "High Risk".......................31

            c.    Umpqua Knew the iCap Entities' Fund Accounts Contained Investor Deposits..........................................32

        iii.    Umpqua's Knowledge of the Ponzi Scheme ...............................34

COMPLAINT - i

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

a.    Umpqua Knew iCap's Business Model Was Not  Viable and Was Not Being Followed ............................................34

b.    Umpqua Concluded iCap's Banking Activities  Were "Out of Pattern" ........................................................................36

c.    Umpqua Knew iCap's Tax Losses Were Incompatible With Chris Christensen's Withdrawals......................................36

d.    Umpqua Knew iCap Was Shuffling and  Commingling Investor Monies ...............................................................37

e.    Umpqua Knew iCap Entities Were Transferring Investor Monies into Chris Christensen's Personal Accounts .........38

iv.    Umpqua's Substantial Assistance to the Ponzi Scheme ................39

a.    Umpqua Did Not End iCap's Banking Services................39

b.    Umpqua Facilitated Fraudulent Money Transfers .............39

c.    Umpqua Failed to Further Investigate Red Flags ..............40

v.    Umpqua Had Knowledge of and Substantially Assisted the Christensens' Breach of Fiduciary Duties ....................................43

FIRST CAUSE OF ACTION (Aiding and Abetting Fraud) ............................................43

SECOND CAUSE OF ACTION (Aiding and Abetting Breach of Fiduciary Duty).........46

PRAYER FOR RELIEF ...........................................................................................49

DEMAND FOR JURY TRIAL .................................................................................49

COMPLAINT - ii

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

Lance Miller and Seth Freeman (the "**Trustees**" or "**Plaintiffs**"), acting in their capacities as Co-Trustees of the iCap Trust (the "**Trust**"), on behalf of the investors who have assigned their claims against third parties to the Trust, hereby allege the following claims against Columbia Bank f/k/a Umpqua Bank ("**Umpqua**" or "**Defendant**"). Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by and through their attorneys and upon their own investigation made by and through their advisors and experts.

## PRELIMINARY STATEMENT

1.    Umpqua has a reputation for going above and beyond for its largest depository clients, but it went to extraordinary lengths to keep Chris Christensen and his iCap Entities[1] happy. In an internal email dated October 22, 2019 from Tim Hoefel (Umpqua's SVP, Regional Director) to Brian Read (Umpqua's EVP and Head of Retail & Business Banking), Hoefel described iCap as "[o]ur largest deposit customer [at Umpqua's Issaquah, Washington branch]" and a "very important customer to the bank."

2.    For Svetla Tzekov ("**Tzekov**"), initially Vice President and Branch Manager of Umpqua's Washington, Issaquah branch office, and subsequently Community Manager, no request from iCap was too large, nor did Tzekov even wait for requests to be made before offering assistance. On February 25, 2022, she went so far as to alert iCap's principals, Chris Christensen and Jim Christensen, that honoring a check would result in insufficient funds in an iCap account. More than that, Tzekov offered to "push it through for payment" anyway so long as iCap transferred money from a different iCap entity by 11am:

---

[1] The iCap entities – purportedly operating as a real estate investment business – which were used by the Christensens to conduct their Ponzi scheme include: iCap Enterprises, Inc.; iCap Pacific NW Management, LLC; iCap Vault Management, LLC; iCap Vault, LLC; iCap Vault 1, LLC; Vault Holding 1, LLC; iCap Investments, LLC; iCap Pacific Northwest Opportunity and Income Fund, LLC; iCap Equity, LLC; iCap Pacific Income 4 Fund, LLC; iCap Pacific Income 5 Fund, LLC; iCap Northwest Opportunity Fund, LLC; 725 Broadway, LLC; Senza Kenmore, LLC; iCap Campbell Way, LLC; UW 17th Ave, LLC; VH Willows Townhomes LLC; iCap @ UW, LLC; VH 2nd Street Office, LLC; VH Pioneer Village LLC; iCap Funding LLC; iCap Management LLC; iCap Realty, LLC; Vault Holding, LLC; iCap Pacific Development LLC; iCap Holding LLC; iCap Holding 5 LLC; iCap Holding 6 LLC; Colpitts Sunset, LLC; CS2 Real Estate Development LLC; and iCap International Investments, LLC (collectively referred to herein as the "**iCap Entities**" or "**iCap**").

COMPLAINT - 1

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

From: Svetla Tzekov <SvetlaTzekov@umpquabank.com>
To: Tatiana N Pantchenko <Tatiana@icapequity.com>, "vera@icapequity.com" <vera@icapequity.com>
Cc: Chris Christensen <Chris@icapequity.com>, Jim Christensen <jim@icapequity.com>
Subject: iCap Pacific Income Fund 4, LLC
Date: Fri, 25 Feb 2022 16:22:58 +0000
Importance: High
Inline-Images: image001.png; image002.png

---

UMPQ-PRIVATE

Good morning, Tatiana and Vera,

We had a check #151 for $97,000.82 presented for payment last night, but there were not enough funds to cover it.

I can still push it through for payment this morning, but would you please let me know what account to transfer funds from to cover it?
You can transfer on your end also.

Please advise before 11:00am. Need the transfer completed by then also.

Thank you!

3.      Likewise, when Chris Christensen alerted Tzekov on May 3, 2021 that he was looking to transfer funds from the iCap accounts to his personal account, both at that time and "more in the future as well" and requested an easier mechanism to do so, Tzekov responded that she would, of course, process the transfers: "you just let me know when and how much." She also consulted with a different department of the bank to figure out the "best/easiest option" for Chris Christensen to process transfers to his personal account without any oversight at all:

///

///

///

///

///

///

///

///

COMPLAINT - 2

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

From: Svetla Tzekov <SvetlaTzekov@umpquabank.com>
To: Chris <Chris@icapequity.com>
Subject: RE: Question
Date: Mon, 3 May 2021 16:27:46 +0000
Importance: Normal
Inline-Images: image001.png

---

UMPQ-PRIVATE

Hi Chris,

We can process these transfers to your personal account when you need them; you just let me know when and how much.
Unfortunately, we no longer add business accounts to the personal online banking profiles.
We can add personal accounts to the business profiles, and the transfers could be facilitated through that platform.
You, as the admin, should be able adjust the settings so that transfers from iCap Realty do not require 2nd approval.
Or, possibly, for your own profile, you can set no second approver is needed.
I would consult with the Treasury Management ( TM) team for their recommendation for the best/easiest option.

Would you like me to check with them and see what would be the easiest way for you to do the transfers yourself?

Thank you,

**Svetla Tzekov**

From: Chris Christensen <chris@icapequity.com>
Sent: Monday, May 3, 2021 9:16 AM
To: Svetla Tzekov <SvetlaTzekov@umpquabank.com>
Subject: Question

**[External Email]**
Hi Svetla,

I need to transfer funds from the iCap Realty account to my personal account.  I will need to do this more in the future as well.  Do you know how I can add iCap Realty to my personal profile so that I can do that more easily, or if there is another way?  Right now, iCap Realty is on the business platform, but we don't need extra approvals for these transfers to me.

Thanks.

4.       It was not unusual for iCap to make large physical cash deposits – oftentimes brought to Umpqua in bags of cash.  iCap never explained to Umpqua why a purported real estate investment company needed to make physical cash deposits.  Tzekov facilitated the Christensens significant cash deposits and withdrawals.  For example, Tzekov suggested procedures to ensure the physical safety of iCap and bank employees during these iCap cash drops:

COMPLAINT - 3

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

From: Svetla Tzekov
Date: September 25, 2019 5:27:53 PM (-04)
To: Annette Berg; Cory Carlisle
Subject: **Re: Withdrawal - Icap**

Attachments:

Thank you, Annette.

Do you know who's coming with Chris?
Connie was originally tasked with the cash withdrawal...I told her it wasn't safe to be alone, and she mentioned someone from the office was coming with her. So, I wonder if she's mentioned something to you...
It wouldn't be safe for Chris to come alone. I can reach out to him one more time.

Svetla Tzekov
VP, Community Manager
NMLS # 730429
O 425-427-1715
D 425-961-4510
M 425-281-4752
www.UmpquaBank.com

5. Umpqua's policies and corporate culture encouraged Tzekov to provide "extraordinary" service to iCap. She described iCap in a June 30, 2023 email as providing a "very profitable and big relationship. . . Basically, he [*sic*] was my biggest deposit client for the past 8-10 years" with "monthly TM fee income … consistently in the range of $2000-$4000 for a number of years." Umpqua's culture linked performance reviews and compensation incentives for bank employees to client account deposit volume, incentivizing its employees to keep deposit accounts at the bank.

6. This culture had an unfortunate drawback: Umpqua wound up attracting and then assisting Ponzi perpetrators. Umpqua's willingness to aid and abet Ponzi perpetrators who were important depository clients resulted in Umpqua paying heavily for its involvement in at least three recent schemes through substantial settlements in litigation brought on behalf of Ponzi scheme victims. Most recently, on September 11, 2025, a district court approved a $55 million settlement

COMPLAINT - 4

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

between Umpqua and a class of investors who were injured in the Professional Financial Investors' Ponzi scheme case.[2]

7.    iCap was another Ponzi scheme that could not have existed without Umpqua's help. The Christensens were operating iCap as a Ponzi scheme.  At all times, they ran their fraudulent enterprise through iCap's bank accounts at Umpqua. And, as it has done before, Umpqua lent substantial assistance to the iCap Ponzi scheme.

8.    Beginning as early as 2013 and continuing until July 2023, the Christensens stole or otherwise squandered approximately $230 million obtained from over 1,800 investors in the United States and abroad (the "**Investors**"), after having induced them to invest their savings in private offerings of debt and equity securities based on false and misleading assurances about the security, profitability, and liquidity of the investments. In reality, funds received from new Investors in the iCap Entities were used to make payments to already existing Investors, and the iCap Entities' real estate business provided little or no return on investment.

9.    Umpqua knew that iCap was a Ponzi scheme. The long-standing and close relationship between the iCap Entities and Umpqua provided Umpqua with unique knowledge of how iCap dishonestly presented its business to Investors versus the reality of the Ponzi scheme. Umpqua had received iCap's organizational documents, knew that iCap's deposits came from Investors, and knew that iCap's accounts at Umpqua held Investor funds. Umpqua thereafter obtained knowledge that iCap was operating a Ponzi scheme through its handling of iCap's banking activities – the indispensable mechanism through which the Christensens perpetrated their fraud.

10.    For example, the Christensens routinely requested that Umpqua process interfund transfers to cover interest payments owed to Investors in other Funds in bank accounts that were routinely overdrawn. The Christensens regularly requested that Umpqua process transfers of

---

[2] https://www.classlawgroup.com/55-million-settlement-approved-in-umpqua-bank-lawsuit;
https://www.oregonlive.com/business/2017/01/oregon_banks_to_pay_16_million.html;
https://www.oregonlive.com/business/2011/01/umpqua_bank_and_insurance_comp.html.

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

Investor funds to iCap's principals. Umpqua was aware that iCap's massive cash deposits were not consistent with its stated business, noting in its "Investigations Worksheet" for the period of 7/29/2020-12/11/2020 that "**[t]he cash deposits do appear out of pattern for an investment firm. . . At this time, the customer was not able to provide a clear source for the cash deposits**." (Emphasis added).  In each instance where Umpqua acknowledged iCap irregularities such as this, Umpqua did nothing to correct or stop the practice.  Instead, Umpqua continued to assist with the fraud that the Christensens were perpetrating through iCap.

11.    Chris Christensen was taking substantial amounts in income while iCap was suffering huge losses.  Umpqua was aware that there was no rational business purpose for Chris Christensen's outsized income in light of these known losses.  In 2019, Umpqua questioned how Chris Christensen was paid when the businesses were losing money. In a November 14, 2019 email, Umpqua's Senior Consumer Underwriter, Patty Brennwald, sought additional diligence from Tzekov on "how [the] business operates as the ordinary income for these businesses is showing huge losses in the millions but [Chris Christensen] is pulling a salary and or guaranteed payment." Subsequently, in a November 19, 2019 email, Tzekov informed Chris Christensen that Brennwald had said: "'**I need more info, I need to know how the client is paying himself while the businesses are reporting losses, need to understand the movement of funds between the businesses and from one fund to another**. I am not saying that we don't have a deal [for a home loan to Chris Christensen] here, but need to understand [Chris Christensen's] income better, and this relates to the businesses he owns.'" (Emphasis added).

12.    Armed with this knowledge, Umpqua, which was in a unique position to stop the Christensens' fraud on Investors, declined to provide a home loan to Chris Christensen when Umpqua's own principal would be at risk, but when it came to the catastrophic losses of iCap's victims' investments, Umpqua instead affirmatively assisted the Christensens' fraud against Investors so that it could keep the iCap Entities as customers and profit from their substantial depository account relationship. Umpqua then took whatever action was requested (or, in some cases, that Umpqua volunteered) to keep the Ponzi scheme afloat.

COMPLAINT - 6

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

13.     Umpqua provided substantial assistance to the Christensens by permitting the iCap accounts to remain open and choosing to refrain from reporting the fraudulent enterprise to law enforcement and/or regulatory authorities, which was required under federal banking law and the bank's own policies and procedures. Umpqua further provided substantial assistance to the Christensens by intervening to cover up insufficient funds, and suggesting, facilitating and processing the interfund transfers which were used to cover interest payments owed to Investors in other Funds and transfers of Investor funds to iCap's principals.

14.     The Christensens could not have operated their fraudulent enterprise without Umpqua's overt assistance in permitting the iCap Entities to maintain their bank accounts at Umpqua while it had actual knowledge of the Christensens' wrongdoing. Umpqua's substantial assistance to the Christensens in perpetrating the iCap Ponzi scheme caused hundreds of millions of dollars in losses to innocent Investor victims. Without Umpqua's knowing assistance, iCap would not have been able to successfully conduct its Ponzi scheme.

15.     On behalf of the Investors, consistent with the authority vested in them by the *Second Modified Second Amended Joint Chapter 11 Plan of Liquidation of iCap Enterprises, Inc. and its Affiliated Debtors Proposed by the Debtors and Official Committee of Unsecured Creditors* [Main Case ECF 1360] (the "**Plan**"), the Order confirming the Plan [Main Case ECF 1414] (the "**Confirmation Order**"), and the iCap Trust Agreement dated November 13, 2024 approved by the Plan (the "**Trust Agreement**"), by this Complaint, the Trustees seek the recovery of the Investors' losses from Umpqua based on its aiding and abetting the Christensens' fraud and breach of fiduciary duty that the Christensens perpetrated in furtherance of the iCap Ponzi scheme.

## THE PARTIES

16.     The Plaintiffs are Lance Miller and Seth Freeman solely in their capacities as the Co-Trustees of the Trust which was formed in accordance with the terms of the Plan and Trust Agreement. The Plaintiffs are both citizens of California.

17.     Pursuant to the Plan and Trust Agreement, the Trust was established to, among other things, pursue recoveries for the Investors as beneficiaries of the Trust. *See* Confirmation

COMPLAINT - 7

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

Order, ¶ 107; Plan, Articles V.D and F. In connection with and following confirmation of the Plan, a substantial majority of the Investors have contributed their claims against third parties, such as the Defendant, to the Trust (the "**Contributed Claims**"). Pursuant to the Plan and Trust Agreement, the Trustees have the right to pursue the Contributed Claims on behalf of the assigning Investors. *See* Confirmation Order, ¶ 86; Plan, Articles V.D and F.

18.    Defendant Columbia Bank f/k/a Umpqua Bank is a wholly owned subsidiary of Columbia Banking System, Inc. Umpqua is a citizen of Washington.

## JURISDICTION AND VENUE

19.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiffs and Umpqua are citizens of different states and the matter in controversy exceeds $75,000.

20.    Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1391(b) because Umpqua's Issaquah branch is located in this District, and a substantial part of the events or omissions giving rise to the allegations contained herein occurred in this District.

## FACTUAL BACKGROUND

**A.    History of the iCap Entities**

21.    iCap Enterprises, Inc. was formed on August 9, 2007. iCap Equity, LLC, its direct subsidiary, was formed on August 15, 2011. Chris Christensen was the founder and Chief Executive Officer of these entities. Chris Christensen was also the sole shareholder of iCap Enterprises, Inc. He and his wife were the sole members of iCap Investments, LLC. Jim Christensen was the Chief Operating Officer of these entities, overseeing iCap's real estate portfolio with authority over project acquisitions, financing, and asset management and disposition. The iCap Entities were all directly or indirectly owned by Chris Christensen, and he decided which entities to form and the purpose each would serve.

22.    Over the course of the next 12 years (from 2011 to 2023), in execution of the Ponzi scheme, various other iCap Entities were formed as specific investment vehicles to accommodate the solicitation of private investments in purported real estate opportunities in the Pacific

COMPLAINT - 8

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

Northwest. The iCap Entities experienced rapid growth and ultimately employed more than 35 people at their Bellevue, Washington headquarters by early 2023.

23.     The iCap Entities were used to invest in two categories of real estate, across two divisions of operations known as the "Portfolio Business" and the "Vault Business." The Portfolio Business was the oldest of the iCap business lines. It operated under iCap Equity, LLC and various subsidiaries. The Portfolio Business purportedly focused on development opportunities for multifamily real estate projects. In some cases, these projects started with raw and undeveloped land, and in other cases the projects began with building permits in place or the improvement of existing structures. The Portfolio Business was funded through private placements of debentures and promissory notes under which Investors were promised interest rates ranging from 6% to 15%. These returns were never realized.

24.     The Vault Business was started in 2018 for the ostensible purpose of investing in standalone real estate investments that had the potential to be or already were cash flow positive. The Vault Business operated under iCap Vault, LLC and various subsidiaries. The Vault Business financed its operations through private placement notes and public demand notes.

25.     The Portfolio Business and Vault Business investments provided little to no return on investment. New investments and intercompany transfers were largely used to pay pre-existing Investors to simulate a return. In addition, new investments and intercompany transfers were used as the source of compensation and purported loans to Chris Christensen, which were transferred into his personal accounts and were never paid back.

**B.      The Christensens Controlled the iCap Entities
         and Were Fiduciaries to the Investors**

26.     The iCap Entities and their various investment vehicles (the "**Funds**" or "**Investment Entities**") were structured to afford complete discretion to Chris Christensen and the iCap fund managers with respect to the specific types of real estate in which Investor funds would be placed, the timing for all such investments, the security afforded to each investment, the decisions regarding when each parcel would be sold, and how each would be appraised and priced

COMPLAINT - 9

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

for sale. The Investors trusted the iCap Entities' principals, the Christensens, as fiduciaries with respect to their investments and these decisions.

27.    Through their lies to Investors, perpetration of the iCap Entities' Ponzi scheme, and other fraudulent conduct, the Christensens breached their fiduciary duties to Investors.

28.    At all relevant times, the Christensens dominated and controlled the iCap Entities. The Christensens exercised sole and exclusive discretion over all investment decisions, the business affairs and operations of the iCap Entities, and the preparation and dissemination of financial information to the Investors. The Christensens led the Investors to reasonably believe that the Christensens were managing the Funds with honesty, integrity, and for the Investors' benefit.

29.    To solicit the Investors, the Christensens touted their supposed judgment and expertise, mastery, and successful track record in real estate investing, luring the Investors with the promise of high returns on low-risk investments, secured by income-producing real estate projects.

30.    Specifically, in the materials that were sent to Investors and in their communications with Investors, the Christensens represented that they were experienced investment professionals with unique expertise and access to opportunities, and that they would manage the Funds with the upmost integrity, transparency, and prudence.

31.    The offering materials for the various Funds represented that Investors must "rely upon the judgment and experience" and "sole discretion" of the "Manager" and its "Affiliates," controlled by Chris Christensen. The "Key Executives" of the Manager included Chris Christensen and Jim Christensen. Both Christensens represented that they had extensive experience in real estate transactions, investments, and asset protection, and that they had managed "over $30 million in development projects and also consulted property owners on the strategy, finance, and execution of the development of their properties."

32.    The Christensens also led the Investors to reasonably believe that the Christensens had accepted responsibility for safeguarding Investor capital, and were, at all relevant times, acting

COMPLAINT - 10

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

in the Investors' best interests and disclosing all material information concerning the Funds' performance.

33.    For instance: between the years 2014 and 2022, the Christensens regularly communicated with the Investors about the iCap Entities and each of its Funds by, among other things: (a) continuing to send to Investors solicitation and informational materials concerning each Fund's stated objectives; and (b) regularly speaking with Investors during quarterly calls. In these communications, the Christensens routinely solicited and encouraged Investors to continue their current investments with iCap, to make new investments with iCap, or to roll over their current investments to affiliated Funds at iCap, while assuring the Investors that the Christensens were looking out for the Investors' best interests and committed to honesty, communication, and transparency. For instance,

- During a November 13, 2020 investor call, to induce Investors to rollover their investments in iCap Pacific Northwest Opportunity and Income Fund, LLC ("**Fund 1**") into iCap Equity, LLC ("**Fund 3**"), Chris Christensen touted Fund 3 as a "really interesting vehicle" and a "good opportunity" that "we wanted to offer to our investors," telling Investors that rolling their Fund 1 investments into Fund 3 would "allow our management team to have more streams of income to take care of our investors."

- During a February 2, 2021 investor call, while giving an update on Fund 1 and iCap Northwest Opportunity Fund, LLC ("**Fund 2**"), Chris Christensen assured Investors that "our goal has always been to make sure we can take care of all of our investors."

- During a February 16, 2022 investor call, Chris Christensen informed Investors during purported updates on the iCap Entities that the Vault Business is a "unique investment," "we've performed on everything so far and we'll continue to do so in the future," "we've been doing a good job taking care of [Investors]," "we're working hard" and "we appreciate your trust."

- During a February 17, 2023 investor call, Chris Christensen told the Investors' advisors "we want to just make sure that going forward, we're committed to good communication, that we have the information you need to help meet with your clients. We want to work together on it. We want to make sure that the investors can get the best situation out of this that they can, and that's really going to depend on how we all communicate and work together." He told them, "we have a really solid team that's very

COMPLAINT - 11

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

committed to getting the absolute optimal outcome for our investors. So you can rest assured that that's the case, that we're giving everything that can possibly be done, and we're just going to need to work together through this. Again, unlike others, we're not trying to cut anything out and we're just being very transparent as far as where everything goes and what we're dealing with at the moment."

- During a March 2, 2023 investor call, Chris Christensen explained to Investors why their repayments would be delayed, and told Investors that with respect to management fees, "we chose to not charge that," and "that's kind of a big deal because we've left millions of dollars in the funds to make sure that our investors were taken care of," assuring Investors "that we're doing absolutely everything humanly possible here," and that the way to move forward is "really good communication," and that "I chose to have this call … in an effort to assure you that we're being transparent and sharing with you what we know. And I hope you can feel that."

34. The Christensens' representations that they were experienced and trustworthy investment professionals caused the Investors to feel safe and secure in their decisions to invest with the iCap Entities, extend maturity dates, or rollover into new investments for multiple years, and, as a result of these representations, the Investors relaxed their care and vigilance accordingly.

35. As passive investors without access to the Funds' books, records, or underlying investments, and because of the Christensens' promises and assurances that they would take care of the Investors with transparency, honesty, and open communication, the Investors justifiably relied on the Christensens to take care of their financial interests.

36. Due to their controlling positions, actions, and representations to the Investors, and the Investors' relationship of trust and confidence in the Christensens, which the Christensens knowingly accepted, the Christensens owed the Investors fiduciary duties, including, but not limited to, the duties of loyalty, care, integrity, candor, full disclosure, and to deal honestly and in good faith.

37. These duties required the Christensens to act at all times in the best interests of the Investors, to avoid self-dealing and conflicts of interest, and to provide truthful and complete information and disclosure concerning the Funds' operations and performance.

COMPLAINT - 12

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

38.     On September 28, 2023, as the Ponzi scheme finally collapsed, Chris Christensen resigned all the positions he held with the iCap Entities. His brother, Jim Christensen, had previously resigned his positions with the iCap Entities.

**C.     The iCap Entities' Operations Bore All The Hallmarks of a Ponzi Scheme**

39.     The Christensens ran their Ponzi scheme through the iCap Entities and their employees and used Investor money to personally enrich themselves.

40.     The Christensens promised the Investors that their investments would be secure and that they would receive steady returns in exchange for their investments. That promise was false. The Christensens did not afford the Investors this promised protection of their invested funds.

41.     The Christensens told the Investors that the promised returns would be paid from the yield generated by the investments. That promise was also false. Instead, the Investors were paid in large part through new Investors' contributions.

42.     The Christensens made repeated false representations to the Investors concerning the Funds and their investments in the Funds including:

- In a May 2016 letter to Investors seeking approval of the extension of the initial maturity date for Fund 1, the Christensens represented that the extension was necessary because of "longer than anticipated processing times for issuing construction and development permits" due to "strong demand for new homes and rental units," when in fact the extension was needed because Fund 1 was experiencing abysmal financial results;

- In a March 1, 2018 letter to Investors seeking a third extension of Fund 1's maturity date, the Christensens represented that the Fund had achieved "strong" returns as of March 1, 2018 – it had not;

- In a quarterly report for Fund 2, the Christensens represented that, as of March 21, 2018, Fund 2 was performing well and that they felt "confident" in Fund 2's continued performance when Fund 2 was not performing well and they had no basis for this representation;

- In a letter dated November 9, 2018, in which the Christensens sought approval of an additional extension of the Fund 2 maturity date to December 31, 2020, they again represented that Fund 2 had achieved "strong returns," when, in fact, it had performed terribly;

COMPLAINT - 13

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

- In a November 21, 2018 investor call, Chris Christensen lied about Fund 2's performance, telling Investors "we've gotten really good returns . . .all those things are going really well;" and

- In the same call, Chris Christensen mispresented that Investors' funds were being deployed into new real estate projects – in fact, they were being used to pay other Investors.

43. The iCap Entities' business operations had all the hallmarks of a large-scale, classic Ponzi scheme.

### i.    The Vast Majority of the iCap Entities' Deposits Came From Investors and Intercompany Transfers, Not Business Operations

44. The iCap Entities maintained their bank accounts at Umpqua. The vast majority of funds deposited by the iCap Entities into their Umpqua bank accounts came from Investors, intercompany transfers, and external lenders, rather than being generated through business operations.

45. The Investment Entities in which Investors directly invested were: Fund 1; Fund 2; Fund 3; iCap Funding, LLC ("**iCap Funding**"); iCap Investments, LLC ("**iCap Investments**"); and iCap Vault 1, LLC ("**Vault 1**").

46. Approximately 95% of the cash deposited with the Investment Entities into their bank accounts at Umpqua was sourced either from Investors or from other iCap Entities.

47. Ponzi schemes are characterized, in part, by obtaining funding from investors' deposits and intercompany transfers, not from business operations. The fact that the Investment Entities' deposits were mainly comprised of cash from Investors and intercompany transfers demonstrates that the iCap Entities were operating as a Ponzi scheme.

### ii.    The Vast Majority of Withdrawals Were To Pay Investors and Make Intercompany Transfers, Not to Fund Investments

48. Withdrawals from the iCap Entities' accounts at Umpqua were not used to fund investments as represented to Investors. Rather, the vast majority of withdrawals from the iCap Entities' accounts at Umpqua were paid out as returns to Investors and intercompany transfers.

COMPLAINT - 14

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

49.     Specifically, during the period between October 2018 and July 2023, approximately $585 million was withdrawn from the iCap Entities' accounts at Umpqua. Transactions related to returns to Investors and intercompany transfers comprised approximately 75% of the iCap Entities' total withdrawals from the iCap Entities' accounts at Umpqua over this period. Withdrawal transactions related to real estate projects or to business operations from the iCap Entities' accounts at Umpqua comprised only approximately 20% of the total withdrawals.

50.     Thus, similar to the deposits, withdrawals from the iCap Entities' Umpqua accounts were largely comprised of money paid to Investors and intercompany transfers, with only a small percentage of the withdrawn amounts going toward real estate investment activities and business operations. Taken together with the deposit activity set forth above, this too shows that the iCap Entities were operating as a Ponzi scheme.

### iii. The iCap Entities' Real Estate Business Operations Produced Little Earnings

51.     Another hallmark of a Ponzi scheme is where the purported business operations of the Ponzi scheme produce little to no profits or earnings. This was true of the iCap Entities.

52.     From September 2013 through December 2020, the iCap Entities invested approximately $103.4 million in properties. Over this seven year investment period, the iCap Entities' $103.4 million in real estate investments generated a paltry net gain of approximately 1.3% from sales and operations.

### iv. The iCap Entities Were Unable to Generate Sufficient Revenue to Meet Their Obligations to Investors

53.     From October 2018 through July 2023, the iCap Entities earned approximately $3.2 million in rental and other revenue from external sources and lost approximately $13.5 million on the sale of properties. During this same period, the iCap Entities paid approximately $236.1 million to Investors. This demonstrates that the iCap Entities' revenue from business operations was insufficient to make the payments to Investors. The iCap Entities' only other sources of funds were

COMPLAINT - 15

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

third party loans in the approximate amount of $55.8 million and Investors' money used to pay other Investors – in other words, a Ponzi scheme.

54. The iCap Entities' internal communications themselves call into question whether the purported investments were being correctly recorded and/or reported. For example, in an email from Jim Christensen to Neil Peritz ("**Peritz**"), the iCap Entities' Vice President of Finance, dated October 6, 2022, Jim Christensen circulated a spreadsheet for an upcoming "Finance Leadership Meeting" containing information on the iCap Entities' real estate investments. Peritz responded saying that certain numbers were "not even in the ballpark" of what was reflected on the iCap Entities' consolidated balance sheet. Peritz then added, "UW and 725 Broadway numbers make no sense to me. UW hasn't started development and 725 Broadway is a parking garage we are demolishing soon to develop so how [do] you get $19.3 [million] in equity on that one?"

55. In addition to internal numbers not matching, certain Investors and their professionals questioned the iCap Entities' investment choices. For example, in an email dated June 26, 2018, Michael Norvet ("**Norvet**") of Evolution Real Estate communicated to the Christensens and others at iCap that: (a) Evolution was not properly informed of a pending real estate transaction; and (b) if it had been, it would not have accepted the sales price to which the Christensens had agreed. Norvet then noted that the estimated loss of $500,000 on the transaction was "completely unacceptable" and that "we reserve the right to take the necessary steps to cancel the sales contracts." Norvet then requested certain documents and a plan to return money to Investors, further stating "this affair has shaken our trust in ICAP."

56. Beginning no later than October 2018, the iCap Entities' real estate business did not generate revenue sufficient to fund payments to Investors. From at least October 2018, internal communications and communications from Investors call into question whether transactions and the business results were being recorded and/or reported reasonably and properly. All of this is emblematic of a Ponzi scheme.

COMPLAINT - 16

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

**v.    Intercompany Transfers and Commingling of Funds**

57.    In a Ponzi scheme, because there is an absence of profits from purported business operations, investors are paid through an infusion of additional cash from new investors. Because of these transfers from one set of investors to another, investors' funds cannot be traced to specific operations, and in order to sustain the scheme, there are typically large transfers of funds among businesses or divisions, often unrelated to business operations or investments.

58.    The Christensens' Ponzi scheme was no exception. Intercompany transfers between the iCap Entities' accounts at Umpqua made up a large share of the iCap Entities' overall cash activity, and there was a commingling of funds such that the funds were effectively pooled in one common fund, making it impossible to trace specific funds.

59.    For example, from October 2018 through July 2023, Fund 1 obtained approximately 91% of its deposits via intercompany transfers between the iCap Entities' accounts at Umpqua, the majority of which were received from iCap Equity, LLC. The relevant accounting records do not reflect any business purpose for these transfers.

60.    In addition, during the same October 2018 through July 2023 period, approximately 91% of Fund 1's withdrawals from the iCap Entities' accounts at Umpqua were used to pay Investors. All or most of the transfers from iCap Equity LLC to Fund 1 were used to pay Fund 1 Investors.

61.    Fund 2 was also infused with cash from iCap Equity, LLC, primarily to pay Investors. Specifically, during the same period, the majority of the deposits to Fund 2 at the iCap Entities' accounts at Umpqua were from intercompany transfers, with just approximately 31% of deposits from business operations. Fund 2's withdrawals then included approximately 55% in returns to Investors and approximately 32% in intercompany transfers.

62.    Further, internal email communications contain repeated requests for funds transfers between the iCap Entities' accounts at Umpqua and indicate that these transfers were required so that the iCap Entities could return money to the Investors for the Fund receiving the transfer.

COMPLAINT - 17

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

63. This practice is reflected in an email from Chris Christensen to Jim Christensen and Cindy Fang, Director of International Relations at iCap, dated April 14, 2022. In that email, Chris Christensen indicated that transfers were made between Funds "two times each month" and that "the 15th of the month is the big one for the interest payments." The email then explained that "iCap Equity is covering a big portion of the expenses from funds we have raised" and that $285,000 was being transferred from affiliate Senza Kenmore, LLC, "to Fund 4 to cover Fund 4 investor payoffs." The schedule included in Chris Christensen's April 14, 2022 email indicates that iCap Investments was transferring $885,000 to iCap Equity, which was then transferring that money to several other Funds.

64. In another email dated December 22, 2022, Vera Rohlfing, an iCap accounting manager, sent Chris Christensen a proposed list of transfers of funds between the iCap Entities' accounts at Umpqua. This email indicated that for iCap International to make a disbursement to an Investor, money needed to be transferred from other iCap Entities.

65. In that case, the proposed transfer included $500,000 from iCap Investments. iCap Investments, however, first received this same $500,000 from 725 Broadway, LLC ("**725 Broadway**") as an intercompany loan. 725 Broadway, in turn, received this money from Vault 1 in the form of an intercompany loan repayment.

66. In an internal email chain dated May 17, 2019, an iCap senior accountant questioned why $200,000 was transferred to Fund 1, to which the Chief Financial Officer, TD Croshaw ("**Croshaw**"), responded "I transferred it to cover the interest payment."

67. The iCap Entities' intercompany funds transfers, coupled with internal email communications, indicate that, from at least as early as October 2018, the Christensens were sustaining the Ponzi scheme through intercompany transfers, and those same intercompany transfers were largely made to repay Investors in the Fund that was the recipient of each transfer. Umpqua was witness to these chronic intercompany transfers of what Umpqua also knew to be Investors' funds.

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

### vi.    Unrealistic Returns Were Required for iCap to <u>Make Its Promised Payments to Investors</u>

68.    Another characteristic of a Ponzi scheme is the promise of consistent unrealistically high returns to investors. These consistent high returns are key to attracting new investments that help sustain a Ponzi scheme. The promised returns are unrealistic because they are not commensurate with the business operations underlying the investments.

69.    The iCap Entities' books and records show that their Funds promised consistent high returns to Investors while failing to generate enough profits to service the promised payments.

70.    The entities under iCap's Portfolio Business primarily raised capital through debentures or promissory note offerings that offered to pay Investors between 6% and 15% in annual interest.

71.    Specifically, the majority of the private placement memoranda (the "**PPMs**") for the Portfolio Business's various debentures and promissory note offerings promised between 9% and 12% annual interest rates that were payable monthly immediately after the closing of the loan. Certain offerings also included a "payoff premium," a one-time additional payment (*e.g.,* 5% of the Investor's investment) on the date of principal repayment.

72.    The primary investment strategy for the Portfolio Business, including Fund 1, Fund 2, and Fund 3, as stated in the relevant PPMs, was to invest in these Funds to acquire preferred equity in the form of joint ventures with qualified builders and developers, with required payoffs within 12 to 18 months from the time of the original investment. These Funds were invested in by the Investors with the objective of generating the promised approximately 12% rate of return, in addition to an exit fee which ranged from 3% to 5%.

73.    Turning these investments quickly, and deploying capital just as quickly, was critical for the iCap Entities' Funds to have any hope of generating sufficient returns to cover Investors' interest and principal payments. However, the iCap Entities' investments never generated sufficient returns to service the indenture interest or ultimate principal, and it was

COMPLAINT - 19

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

therefore necessary for the iCap Entities to obtain funding for the returns to Investors from other sources.

74. The iCap Entities' investment strategy for its Portfolio Business did not align with the terms of the debt instruments they issued to raise capital from Investors. First, almost all the debentures and promissory notes issued by the Funds offered the option of monthly interest payments to Investors immediately after the closing of the applicable loan. Because the Funds primarily invested in new real estate developments, the representation that the iCap Entities could begin generating near-immediate returns on such real estate was unrealistic and misleading.

75. The PPMs relating to the iCap Entities' debt offerings provide that some of the capital might be deposited into interest reserve accounts, or that the Funds "will maintain cash reserves to meet interest payments . . ." However, there is no indication that any such cash and interest reserves were ever established, and even if they were, establishing such reserves would have decreased the net capital available for the iCap Entities to invest in real estate projects, thereby requiring the remaining Funds soliciting investments to generate even higher returns to pay off the Investors.

76. The iCap Entities' internal projections from as early as January 2017 shed light on the company's cash flow concerns. For example, in an email to Chris Christensen dated January 24, 2017, Croshaw provided a management budget to Chris Christensen, and stated "we are going to be in a significant deficit at the end of February and the first of March . . . January was a bad month for us." Later that year, Croshaw provided another management budget to Chris Christensen in an email dated November 10, 2017. In that email, Croshaw stated "as you can see we are significantly in the Red for [November and December 2017]." Croshaw went on to state that iCap would "need to come up with" $320,000 to make its November and December 2017 payroll payments.

77. While aware of these grave cash flow concerns, Chris Christensen failed to acknowledge or disclose these concerns publicly. For example, in a call with Fund 2 Investors in November 2018, in response to a question about the sources of funds on which the iCap Entities

COMPLAINT - 20

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

relied to pay the Investors, Chris Christensen represented that interest payments were carved out of payoffs from real estate projects and that such payments were not serviced using funds received from other Investors. Those representations by Chris Christensen were false and misleading.

78.    From October 2018 through September 2023, Fund 2 paid out a sum of approximately $20.2 million to its Investors. However, during the same period, Fund 2 generated only approximately $10.4 million in funds from business operations, including rent and project payoff, which, even before accounting for approximately $1.7 million in general, operating, and administrative expenses during the same period, is approximately half of what was paid out to Investors. Fund 2 also received approximately $22.9 million in intercompany transfers and transferred approximately $11.8 million to other iCap entities.

79.    The Investment Entities' investments in real estate development projects did not generate the promised ongoing returns immediately upon closing. Moreover, they did not generate the very high annual returns that were required to service the promised interest payments, as well as to make the promised final principal payments. For example, Fund 1 raised capital in December 2013 through a private placement of senior debentures that matured in December 2016. The terms of the offering stated that Investors were entitled to 12% annual simple interest paid monthly. As part of the offering, Fund 1 indicated that it expected to incur 13% in commissions and administrative fees related to the offering, which brought down the overall proceeds from Investors that would be available for investment to about 87% of the total proceeds.

80.    Fund 1 also owed a 2% management fee annually and an origination fee of up to 3% on every investment made. Assuming a 36-month term, Fund 1 would have needed a 17.6% annual return on its overall investments to service the interest payments and pay the principal at maturity, as promised to Investors.

81.    Fund 1 did not generate nearly as much as the 17.6% in annual returns it needed to pay its Investors. In fact, it made a net gain of only $1.3 million on the total $44.1 million that the Fund invested in various real estate projects from March 2014 (the date of its first investment) to

COMPLAINT - 21

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

January 2022 (the date of its most recent exit from the properties), or an average return of 0.4% per year.

82.    Similarly, Fund 2 raised capital through a private placement of senior secured debentures at a 10% annual interest rate, paid monthly. Under the terms of this offering, Fund 2 would have needed to generate 16.4% in annual returns to pay its Investors as promised.

83.    The reality was that Fund 2 invested $40.4 million in real estate projects from May 2015 through December 2018 and generated a total return of $2.7 million upon exiting these properties from October 2015 to July 2022, for an average return of 0.9% per year.

84.    In total, the iCap Entities invested approximately $103 million in real estate projects from 2013 to 2022 across its Portfolio Business and received approximately $104.4 million upon exiting the projects, an astonishingly low net return of only $1.4 million over a nine year period. This extremely low return demonstrates that the iCap Entities would not have been able to pay off the Investors from the appreciation in the real estate investments and chose instead to use funds raised from other Investors to make such payments.

85.    The iCap Entities' internal communications indicate that it was unrealistic that the promised returns to Investors would be able to be made. For example, in a May 26, 2020 email to Jim Christensen and other iCap executives regarding his analysis of a potential Fund 6, Andy Willett ("**Willett**"), iCap Director of Capital Markets, concluded that to meet the repayment demand of raising between $310 million and $470 million, iCap would need to invest in between 959 projects and 1,056 projects. Willett concluded that "the numbers look daunting to me" and that iCap would have to have most or all the Fund 1 and Fund 2 Investors roll over to Fund 6, while agreeing to not receive a monthly interest payment. The numbers were indeed daunting; as described above, the iCap Entities were not able to pay off Investors from the appreciation of the real estate investments. This too demonstrates that the iCap Entities were operated as a Ponzi scheme.

COMPLAINT - 22

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

vii.    **Other Hallmarks of the iCap Entities' Ponzi Scheme**

a.    **iCap Failed to Invest Investors' Funds in Promised Investments**

86.    In a Ponzi scheme, the organizer often fails to invest the investors' funds in promised investments. This is particularly true for investments from later investors, whose funds are either transferred to earlier investors or are used to cover costs of the purported underlying business operations. This proved true for the iCap Entities' later funds.

87.    The applicable PPM for Pacific Income Fund, LLC ("**Fund 4**"), which was launched in or around October 2018, and the sources and uses analysis of Fund 4's funding, reveal that the capital invested in Fund 4 was not invested in accordance with the PPM's representations.

88.    For example, Fund 4 sought to raise $50 million in capital through an offering of secured promissory notes in October 2018. The promissory notes had a maturity of 20 years but allowed the Investors to redeem their investments in full after 3 years.

89.    The PPM for Fund 4 states that "the primary purpose of the Company is to acquire real estate investments in the United States and provide a rate of return to its investors." The PPM also makes representations about the potential use of the funds. In particular, the PPM states that the "proceeds … will be used to pay expenses related to its formation and operations and for this Offering, and to purchase and manage preferred equity real estate positions through Portfolio SPEs. The proceeds will be used to cover costs associated with this process. . . ."

90.    The Fund 4 PPM also made provision for organizational expenses approximating $250,000 as well as additional expenses of approximately $200,000 in addition to commission charges for placement agents.

91.    The representations in the Fund 4 PPM were false. A comparison of Fund 4 PPM's representations with the actual allocation of funds reveals that the funds received from Investors were not allocated in accordance with the PPM.

92.    Thus, a total of $23.9 million was deposited in Fund 4's account at Umpqua between October 2018 and September 2023. Of these deposits, $12.4 million were funds from

COMPLAINT - 23

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

Investors, and $11.4 million were intercompany transfers, with almost no funds from other sources. Fund 4 then disbursed $4.9 million to Investors from its account at Umpqua and transferred $9.5 million to other iCap Entities, while only using $2.2 million for real estate acquisition, development, and investment.

93.    This means that only 9.7% of Fund 4's withdrawals from Umpqua accounts were used for investments in real estate projects even though raising capital for new real estate investments was purportedly the primary objective of Fund 4. Furthermore, while the PPM for Fund 4 made provision for expenses and commissions, it allocated more money to expenses and commissions than to investments in real estate projects.

### b.    Later Investors Received Lower Returns Than Those Received By Earlier Investors

94.    In a Ponzi scheme, companies typically are incapable of generating adequate revenue to fulfill the promised returns to their investors. Consequently, they resort to using funds from later investors to pay off earlier investors. Thus, one of the characteristics of Ponzi schemes is that later investors receive lower returns compared to their earlier counterparts.

95.    This is exactly what happened to Investors in the Funds, as only Investors who invested in Fund 1 received distributions in excess of their investments on average, while subsequent Investors in the Funds on average received less than they invested.  For example, Fund 1, on average, managed to achieve 12% distributions in excess of investments, while Fund 2, Fund 3 and Fund 4, iCap Pacific Funding, LLC ("**Fund 5**"), Vault 1, iCap Investments, and iCap Funding all returned less than the original investments. The amounts returned for Funds 2 through 5, Vault 1, iCap Investments, and iCap Funding ranged from approximately 8% to 81% less than the original investment amount.

96.    In sum, the Christensens operated the iCap Entities as a Ponzi scheme.

COMPLAINT - 24

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

### viii. As the Ponzi Scheme Collapses, the iCap Entities Seek Bankruptcy Protection

97.     On September 29, 2023 (the "**Petition Date**"), the iCap Entities filed chapter 11 cases in the United States Bankruptcy Court for the Eastern District of Washington (the "**Bankruptcy Court**"), Case No. 23-01243-WLH11. On October 9, 2024, the Debtors, jointly with the Official Committee of Unsecured Creditors, filed the Plan. On October 18, 2024, the Bankruptcy Court entered the Confirmation Order.

98.     As part of the Confirmation Order, the Bankruptcy Court found that the iCap Entities operated as a Ponzi scheme beginning no later than October 2018 through July 2023 (the "**Ponzi Period**") (the date range for which evidence was provided of the Ponzi scheme operation in connection with confirmation of the Plan). *See* Confirmation Order ¶¶ 17, 74, 77.

99.     Specifically, the Bankruptcy Court entered the following findings (the "**Ponzi Findings**") as part of the Confirmation Order based upon the evidence submitted in connection with Plan confirmation:

    a.      beginning no later than October 2018 (the "**Ponzi Start Date**") through the conclusion of the prepetition time period analyzed by the CRO and his advisors (which, for the avoidance of doubt, ended prior to the retention of new counsel and financial advisors by the Debtors in July 2023), the principals operated the iCap enterprise as a Ponzi scheme raising approximately $230 million from over 1,800 investors in the United States and abroad;

    b.      the Ponzi scheme involved the use of funds provided by new investors to the iCap enterprise to make payments to already-existing investors and other creditors; and

    c.      the iCap enterprise did not operate as a legitimate profit-making business. *See In re EPD Inv. Co.,* 114 F.4th 1148, 1162-63 (9th Cir. 2024).

*See*, Confirmation Order ¶ 75 at 38.[3]

---

[3] The court's Ponzi Findings noted that they were not binding at that time upon Umpqua.

COMPLAINT - 25

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

**D.    In Breach of His Fiduciary Duties, Chris Christensen Converted Investor Funds**

100.    Chris Christensen also converted substantial portions of Investor funds located in Umpqua bank accounts for his personal benefit, in violation of the trust the Investors had in him to manage and protect the Investors' money with care, diligence, and honesty.

101.    The Investors entrusted Chris Christensen to invest their funds into income-producing real estate and to manage the investments for the benefit of the Investors in accordance with each of the Funds' stated investment objectives. The Investors retained ownership interests in their invested funds, including the monthly interest payments, principal contributions, and any proceeds derived from those funds.

102.    During the time period from 2013 through 2023, Chris Christensen, intentionally and without authorization, improperly transferred Investors' funds, in the total aggregate amount of $30,469,282: (a) to his personal bank accounts; (b) to accounts belonging to companies or entities he owned and/or controlled; (c) to accounts used to fund his personal lifestyle expenses, including vacation homes; or (d) to repay his personal debt obligations.

103.    Below is a table setting forth the amount of the iCap Entities' funds held at Umpqua that Chris Christensen improperly converted to himself or to his entities from 2013 through 2023 (not including amounts to Oceanaire detailed below):

| Year | $ Amount |
|---|---|
| 2013 | 146,260 |
| 2014 | 1,001,788 |
| 2015 | 2,029,738 |
| 2016 | 1,741,300 |
| 2017 | 935,393 |
| 2018 | 26,107 |
| 2019 | 1,189,748 |
| 2020 | 2,420,365 |
| 2021 | 891,551 |
| 2022 | 16,402,416 |
| 2023 | 1,170,076 |
| **Chris Christensen Total Transfers** | **27,954,741** |

COMPLAINT - 26

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

104.    One of the entities that was the recipient of Chris Christensens' conversion of iCap Entities' funds was Oceanaire, LLC ("**Oceanaire**"), the entity that owned his vacation home. On January 26, 2016, Chris Christensen transferred $450,000 from investment fund iCap Pacific NW Management to Oceanaire and then wired $469,122.96 to First American Title Company for the purchase of his vacation property, noting the borrower as Oceanaire. Between the years 2013 and 2023, Chris Christensen transferred funds from the iCap Entities to Oceanaire in the total aggregate amount of $2,514,540.

105.    Chris Christensen's improper transfers of Investors' funds from accounts at Umpqua to his personal accounts and accounts of entities he owned and controlled for his own benefit were falsely documented as "loans," "reimbursements," or "distributions." None of the purported "loans" were ever repaid, and despite being recorded as "reimbursements" or "distributions," none of these diversions of Investors' funds caused by Chris Christensen were actually for those purposes. Chris Christensen's improper transfer of Investor funds to his personal accounts is conversion and epitomizes his breach of the fiduciary duties he owed to Investors.

**E.    Umpqua's Role in the Scheme**

**i.    The iCap Entities Were a Major Client of Umpqua's Issaquah Branch**

106.    The iCap Entities' banking relationship with Umpqua began no later than 2013 and continued through the entirety of the Christensens' operation of the iCap Entities as a Ponzi scheme. The iCap Entities were a significant client of Umpqua, and the most important customer of the Issaquah branch office.  An internal email dated October 22, 2019 from Tim Hoefel (Umpqua's SVP, Regional Director) to Brian Read (Umpqua's EVP and Head of Retail & Business Banking) described iCap as "[o]ur largest deposit customer [at the Issaquah branch office]."

107.    Tzekov was the principal Umpqua contact for the Christensens during the operation of the iCap Ponzi scheme and was responsible for servicing and monitoring all the corporate and personal accounts of the iCap Entities and the Christensens.

COMPLAINT - 27

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

108.    In a June 30, 2023 email to Rebecca Cherney, Umpqua's SVP, Upper Puget Sound Regional Manager, Tzekov extolled iCap as providing a "very profitable and big relationship. . . Basically, he [*sic*] was my biggest deposit client for the past 8-10 years" with "monthly TM fee income . . . consistently in the range of $2000-$4000 for a number of years." Tzekov wrote that email almost exactly three months prior to iCap's September 29, 2023 bankruptcy filing.

109.    Tzekov's reference to iCap's profitability points to Umpqua's corporate culture that placed excessive importance on the number of accounts and average balances in accounts, not only to generate fees for Umpqua, but also in the form of additional compensation to the branch employees who serviced those accounts. More deposits and accounts meant better performance reviews and better compensation.  Umpqua maintained a "store success" system where branch managers tracked whether their branch was on track to meet that goal, and branch personnel were judged and compensated based on whether those goals were met.

110.    If the Issaquah branch lost some or all of iCap's deposits, that would have a significant effect on whether the branch and its employees were deemed successful by Umpqua, how much they were paid, and potentially even whether they would keep their jobs. Umpqua went so far as to place branches and regional areas in competition with each other for financial incentives based on deposit growth and new accounts. Branches were grouped into teams called "Gold Diggers" or "Money Maker Bankers," and branches were alerted on a weekly basis how they were faring in the competition.

111.    It is, therefore, no surprise that when the Christensens said they would move their deposits to another bank if Umpqua did not reduce its fees, Umpqua went into overdrive to retain the iCap Entities as banking clients.

112.    On September 25, 2022, Jim Christensen shared a proposal iCap had received from Chase Bank for depository services, requesting "to set up a time to discuss what Umpqua could do for iCap." Tzekov immediately, and with a sense of panic, sought assistance from her higher-ups. On September 30, 2022, Tzekov emailed Gina Simpson, Umpqua's Treasury Management Sales Consultant, for assistance in creating a competing proposal:

COMPLAINT - 28

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

Bush Kornfeld LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

". . . I have a situation that I need to run by you.

I am really sorry to present a challenging situation the very first time we work together.

However, this is a huge business relationship, and I am hoping we can find a solution to keep it at Umpqua.

. . . We would definitely need all the support we can get.

I am thinking we may need Private and International for feedback and ideas as well. . . ."

113.    Patricia Murphy, a Senior Deposit Relationship Manager, understood Tzekov's concerns, writing to Tim Hoefel, SVP, Regional Director Northwest Region, on October 10, 2022: "[Svetla] is in serious danger of losing this relationship if she does not receive in-person assistance with her client call." She then followed up on the same day with a different Umpqua colleague, Lorin Wingate: "Chase submitted a proposal. We will have to meet it. But she needs in person help. . . . I don't want this to end up with me, or Svetla could lose the deposits."

114.    Hoefel elevated the concerns to another level: on October 22, 2022, he emailed Brian Read, Umpqua's EVP and Head of Retail & Business Banking, to obtain approval of their "proposal to retain this very important customer to the bank."

115.    When the Christensens informed Umpqua that they would continue to keep the accounts at Umpqua, numerous congratulatory emails were circulated internally within the bank. In light of Umpqua's policies, Tzekov and the Issaquah branch employees had much to celebrate. The iCap Investors did not.

      ii.    **Umpqua Paid Close Attention to iCap, Was Familiar With the Nature of its Business and Accounts, and Appropriately Categorized iCap as "High Risk"**

      a.    **Umpqua's Obligations to Monitor for Fraud**

116.    Monitoring customers for potential fraud is an essential responsibility of all banking institutions under the Bank Secrecy Act ("**BSA**"). Passed in 1970 and amended through the years, the BSA "is intended to safeguard the U.S. financial system and the financial institutions

COMPLAINT - 29

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

that make up that system from the abuses of financial crime, including money laundering, terrorist financing, and other illicit financial transactions."

117.    Congress established the Federal Financial Institutions Examination Council ("**FFEIC**") in 1979. FFEIC prescribes uniform principals, standards, and report forms for the federal examination of financial institutions and makes recommendations to promote uniformity in the supervision of financial institutions.

118.    The FFEIC Bank Secrecy Act (BSA)/Anti-Money Laundering (AML) Examination Manual provides guidance to examiners for carrying out Bank Secrecy Act/Anti-Money Laundering ("**BSA/AML**") and Office of Foreign Assets Control ("**OFAC**") examinations. An effective BSA/AML compliance program requires sound risk management; therefore, the manual also provides guidance on identifying and controlling risks associated with money laundering and terrorist financing. The manual contains an overview of BSA/AML compliance program requirements, BSA/AML risks and risk management expectations, industry sound practices, and examination procedures.

119.    Under the Bank Secrecy Act and 12 CFR §326.8, a bank's board of directors is required to approve a written comprehensive BSA compliance program and set of internal controls to ensure ongoing compliance. Similarly, in accordance with the USA PATRIOT Act, Financial Crimes Enforcement Network ("**FinCEN**") requires certain financial institutions to establish an AML compliance program that guards against money laundering and terrorist financing and ensures compliance with the BSA and its implementing regulations. Under these frameworks, banks must be able to identify and take appropriate action once put on notice of any of a series of anomalies in account behavior or "red flags" that could indicate unusual or suspicious activity.

120.    Umpqua must comply with BSA/AML requirements. Umpqua had internal controls in place designed to detect if a customer was conducting a Ponzi scheme, including a customer identification program; customer due diligence processes; account opening and monitoring procedures; ongoing training for employees; and an automated account monitoring system. Umpqua utilized sophisticated account activity monitoring systems to identify banking

COMPLAINT - 30

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

transactions or patterns that reflect anomalies or raise "red flags" indicative of potentially improper or illegal activity.

121.    A core aspect of Umpqua's anti-money laundering compliance, as required by federal law, is KYC (or Know Your Customer). KYC refers to the process that Umpqua (and other financial institutions) follow to verify the identity of their customers, assess their risk profile, and monitor their transactions upon account opening and throughout the banking relationship. When a bank is familiar with a customer's business and account structure, it can much more easily recognize transactions that lack a business justification, are atypical for banking customers engaged in similar businesses, or are otherwise inconsistent with legitimate business operations, and therefore may indicate the customer is engaging in illicit activity.

122.    At all relevant times hereto, Umpqua's KYC process consisted of several legally required steps including: (1) customer onboarding, including the collection and verification of identification documents; (2) a Customer Identification Program or "CIP" to determine if, for example, a customer is on a sanction or watch list; (3) Customer Due Diligence or "CDD" to understand the nature of the customer's business; (4) Enhanced Due Diligence or "EDD" including heightened scrutiny on account activity for high risk customers, and, if necessary filing Suspicious Activity Reports with relevant law enforcement authorities; and (5) ongoing monitoring to detect and flag unusual patterns or transactions.

### b.    Umpqua Categorized iCap as "High Risk"

123.    Umpqua knew iCap and its principal, Chris Christensen, extraordinarily well. In addition to the required onboarding and KYC processes that Umpqua undertook, branch employees knew Chris Christensen, not just on a need-to-know KYC level, but on a personal level. Tzekov visited Chris Christensen at his offices and, at one point, asked for a job at iCap. Tzekov assisted Chris Christensen and other iCap employees with their daily transactions and transfers, in addition to receiving and depositing significant amounts of physical cash.

124.    In fulfilling its KYC obligations, Umpqua determined that various iCap Entities were "High-Risk." Umpqua conducted at least seventeen "Enhanced Due Diligence Reviews" on

COMPLAINT - 31

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

various iCap Entities or affiliates between August 24, 2021 and November 21, 2023. Each Enhanced Due Diligence Review lists: "**Risk Level: HIGH**." The Reviews explain that the Actimize internal system they relied on recognized risk factors, including: (a) location in a high risk geographic area; (b) prior suspicious activity reports; (c) a cash-intensive business; (d) "Account Opening Channels"; and (e) related high-risk parties.

125.    As a result of the iCap Entities' High-Risk Business Customer classification, Umpqua conducted Enhanced Due Diligence (EDD) on iCap, including performing heightened scrutiny of iCap's account activity with the bank's sophisticated account activity monitoring systems throughout the duration of iCap's banking relationship with Umpqua.

### c.    Umpqua Knew the iCap Entities' Fund Accounts Contained Investor Deposits

126.    The long-standing and close relationship between the iCap Entities and Umpqua provided Umpqua with knowledge of the nature and business of the iCap Entities. Umpqua also understood that the Funds' accounts contained Investor monies which were to be used for real estate investments. Umpqua conducted substantial due diligence with regard to the identity of Chris Christensen, the nature of the iCap Entities, the source of the iCap Entities' revenue, and anticipated types of transactions. In an internal email from Tim Hoefel to Brian Read on June 8, 2020, Hoefel, Umpqua's SVP and Regional Director for the Northwest Region, described Tzekov as having "**worked very closely with [Chris Christensen/iCap] since they joined us in 2013 and knows this business inside and out.**" (Emphasis added).

127.    First, Umpqua knew of the nature and business of the iCap Entities as a result of reviewing iCap's organizational documents and financial statements. As Chris Christensen sought to open new accounts for the various iCap Entities or Funds, Umpqua sought and received related documents such as operating agreements. For example, when Umpqua sought to open an account for iCap Pacific Income Fund 5, LLC in 2019, iCap's Senior Accountant provided to Umpqua the signed Limited Liability Company Operating Agreement of iCap Pacific Income Fund 5, LLC, its Certificate of Formation, and Certificate of Registration, among other documents. iCap provided

COMPLAINT - 32

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

similar documents in connection with other account openings. Umpqua was also supplied with quarterly financial statements and tax returns for various iCap Entities and Funds. Umpqua is accountable for its knowledge of these important documents in its possession. These important documents demonstrate that iCap's business was supposed to be predicated on obtaining other people's money and then investing that money in real estate investments, which would then provide a return on investment. Umpqua knew that.

128.    In addition, Umpqua knew of the nature and business of the iCap Entities as a result of the bank's diligence into Chris Christensen on the occasions he sought a personal home loan or line of credit. In connection with one such personal request for credit, Chris Christensen provided a Statement of Financial Condition on March 31, 2022 regarding the purported nature of the iCap enterprise in summary form to Umpqua, stating:

> iCap Enterprises, Inc., a Washington corporation, . . . is the parent company of multiple investment funds and fund management companies that invest in real estate development and construction projects in the Pacific Northwest. iCap Enterprises, Inc. also owns 100% of iCap Vault, LLC which has issued $1 billion of securities, with $500 million of such securities being publicly registered with the SEC . . . The subsidiary entities are financed with private placement promissory notes, which are necessarily booked as liabilities.

129.    Umpqua also periodically ran Google and Lexis searches on various iCap Entities.

130.    Through all the foregoing sources of information, Umpqua knew that accounts at Umpqua held Investors' deposits and that Investors believed they were investing in a legitimate real estate investment business in reliance upon what iCap and the Christensens had represented to them.

131.    Umpqua's knowledge that iCap's accounts at Umpqua held Investor funds is also confirmed in various internal communications. For example, in a response to a 2020 request for information from the Financial Investigations Department at Umpqua, Tzekov explained to Alex Bryant, Umpqua's AML Investigations Analyst for the Financial Investigations Department, that the source of $413,085.00 in cash deposited into iCap's accounts at Umpqua which had raised an alarm were iCap's "Investors . . . clients' funds." Tzekov also informed Bryant that an outgoing

COMPLAINT - 33

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

international wire was an investor "[r]edemption . . . [t]his was a wire for a redemption of the capital investment of this individual."

### iii.    Umpqua's Knowledge of the Ponzi Scheme

132.    Umpqua learned the iCap enterprise was a Ponzi scheme through its unique view into iCap's financial activities. Umpqua not only *saw* the red flags and activity which informed Umpqua that the Christensens were operating a Ponzi scheme, Umpqua also *investigated* various elements of iCap's business and transactions which demonstrated the Christensens' Ponzi scheme was being perpetrated through Umpqua bank accounts.

### a.    Umpqua Knew iCap's Business Model Was Not Viable and Was Not Being Followed

133.    A Ponzi scheme is essentially a shell game where the fraudster lacks sufficient legitimate funds, *i.e.,* actual revenues from investments, to meet its obligations to existing investors but is able to perpetuate operations by shuffling funds from new investors or funds earmarked for other purposes to cover obligations to existing investors.

134.    Frequently overdrawn accounts are considered a major red flag for Ponzi schemes and other illicit activity precisely for this reason. The FDIC provides guidance for banks regarding red flags in the Bank Secrecy Act and Anti-Money Laundering section of its Examination Manual. Two such red flags are "[a]ccounts with a high volume of activity, which carry low balances, or are frequently overdrawn," and customers who "request[] a high volume of incoming and outgoing wire transfers but maintain[] low or overdrawn account balance."

135.    In the case of the iCap Ponzi scheme, its real estate investments generated insufficient revenue to meet the monthly obligations owed to Investors and real estate lenders. iCap's bank accounts at Umpqua were frequently overdrawn and/or carried negative balances. To keep the Ponzi scheme going, iCap would simply shuffle funds from other accounts – including accounts that it knew contained new Investor money – to cover the deficits, overdrafts, and obligations to existing Investors. iCap waved both of those red flags.

COMPLAINT - 34

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

136.    Umpqua knew that iCap's business model was not able to return funds to Investors at the rates promised. As early as February 2013, Tzekov was willing to transfer funds between accounts to cover a negative balance and allowed Chris Christensen to transfer funds between the business accounts. In a January 8, 2014 email, Tzekov informed Chris Christensen that the iCap Management account "is negative again," to which Chris Christensen promised only that "we will look into it." There is no evidence Tzekov ever bothered to follow up on this. On January 24, 2014, Jodee Berg, a Lead Associate at Umpqua, sent an email to Chris Christensen informing him that the iCap Management account "has been overdrawn for 18 days." Umpqua also reviewed various tax returns of the iCap Entities and recognized that they were taking huge losses. Umpqua understood the cash balance position in the iCap accounts and net losses of the iCap enterprise and, accordingly, knew the iCap enterprise was not a viable business.

137.    Umpqua also knew that the vast majority of funds deposited by the iCap Entities into their Umpqua bank accounts came from Investors, intercompany transfers, and external lenders, rather than being generated through business operations. Umpqua had direct visibility into the deposits and could tell that approximately 95% of the cash deposited with the Investment Entities was sourced either from Investors or from other iCap Entities.

138.    Similarly, Umpqua knew that withdrawals from the iCap Entities' accounts were not used to fund investments as represented to Investors. Rather, the vast majority of withdrawals were paid out as returns to Investors and intercompany transfers, a fact uniquely visible to Umpqua. Specifically, during the period between October 2018 and July 2023, approximately $585 million was withdrawn from the iCap Entities' accounts at Umpqua. Transactions related to returns to Investors and intercompany transfers comprised approximately 75% of the iCap Entities' total withdrawals over this period. Withdrawal transactions related to real estate projects or to business operations comprised only approximately 20% of the total withdrawals.

139.    Umpqua knew that the Investment Entities' deposits were mainly comprised of cash from Investors and intercompany transfers *and* that withdrawals from the iCap Entities' Umpqua accounts were largely comprised of money paid to Investors and intercompany transfers, with only

COMPLAINT - 35

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

a small percentage of the withdrawn amounts going toward real estate investment activities and business operations. Umpqua had knowledge that the iCap Entities were not operating their stated business and were operating a Ponzi scheme.

### b.    Umpqua Concluded iCap's Banking Activities Were "Out of Pattern"

140.    Umpqua saw inflow and outflow patterns that informed Umpqua of the Ponzi scheme. In addition, as early as 2020, Umpqua *concluded* that certain of iCap's banking activities were "out of pattern for an investment firm." In 2020, Umpqua conducted a 90-day review with respect to suspicious activity within the iCap accounts. Umpqua prepared an Investigations Worksheet covering the period of 7/29/20 – 12/11/2020, noting:

> The account is primarily funded via ACH, wire, and check deposits, however there was approximately $400k in cash deposits during the review period as well. One cash deposit was matched by a same day outgoing international wire to [individual Investor] for $100,000.00, which may be related or coincidental. ***The cash deposits do appear out of pattern for an investment firm***. . . At this time the customer was not able to provide a clear source for the cash deposits. (Emphasis added).

### c.    Umpqua Knew iCap's Tax Losses Were Incompatible With Chris Christensen's Withdrawals

141.    Umpqua knew that iCap's reported losses on its taxes were incompatible with Chris Christensen's receipt of funds from iCap. On Thursday, November 14, 2019, Patty Brennwald, acting in her capacity as a member of Umpqua's underwriting group, wrote Tzekov and said she wanted to ". . . see the full tax returns for the iCap businesses reporting on the 2018 return . . ." and further requested "a written explanation from the customer [Chris Chistensen, who at the time was applying for a personal real estate loan] on how his business operates as the ordinary income for these [iCap] businesses is showing huge losses in the millions but he is pulling a salary and or guaranteed payment."

142.    On Wednesday, November 20, 2019, Tzekov forwarded Brennwald's questions to Chris Christensen with a subject line of "HELOC follow-up" and reported:

COMPLAINT - 36

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

Patty said, "I need more info, I need to know how the client is paying himself while the businesses are reporting losses, need to understand the movement of funds between the businesses and from one fund to another. I am not saying that we don't have a deal here, but need to understand the borrower's income better, and this relates to the businesses he owns."

Umpqua's diligence and knowledge was enough for it to conclude Chris Christensen's application for a home loan should be rejected. Umpqua, accordingly, not only possessed the information necessary to realize iCap was operating as a fraudulent enterprise, but realized and acted on that information by refusing to make a home loan to Chris Christensen. Umpqua thus took care not to risk its own funds based on its knowledge of iCap's "huge losses." Unfortunately, as set forth below, it did not act on the same information to shut down the Ponzi scheme. Umpqua shut down the Chris Christensen loan. It did not shut down the iCap Ponzi scheme.

### d.     Umpqua Knew iCap Was Shuffling and Commingling Investor Monies

143.    Umpqua knew that iCap was shuffling and commingling Investor funds within its accounts at Umpqua – another hallmark of a Ponzi scheme. Additionally, Umpqua knew that there was a commingling of funds such that the funds were effectively pooled in one common fund. For example, from October 2018 through July 2023, Fund 1 obtained approximately 91% of its deposits at Umpqua via intercompany transfers, the majority of which were received from iCap Equity, LLC. In addition, during the same October 2018 through July 2023 period, approximately 91% of Fund 1's withdrawals were used to pay Investors. All or most of the transfers from iCap Equity LLC to Fund 1 were used to pay Fund 1 Investors.

144.    Fund 2 was also infused with cash from iCap Equity, LLC, primarily to pay Investors. Specifically, during the same period, the majority of deposits to Fund 2 were from intercompany transfers, with just approximately 31% of deposits from business operations. Fund 2's withdrawals were comprised of approximately 55% in returns to Investors and approximately 32% in intercompany transfers

145.    Umpqua was aware of the structure of the Funds, had visibility into the inflows and outflows of money in the iCap accounts, and knew there could be no valid business purpose for

COMPLAINT - 37

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

these transfers. In addition to general oversight on the iCap accounts, Tzekov sent and was copied on emails exposing the transfers. For example, on April 5, 2022, Tzekov sent an email to iCap personnel to inform them that a $20,000 payment "to [iCap Investor] pushed the account into NSF status . . . if you are able to transfer before 10:00am . . . I can pay the items." iCap's Senior Accountant, Vera Rohlfing, emailed the Christensens (*copying Tzekov*) requesting a transfer from Fund 3 to Fund 2 to "avoid [the] NSF situation."

### e.    Umpqua Knew iCap Entities Were Transferring Investor Monies into Chris Christensen's Personal Accounts

146.    Umpqua knew that Chris Christensen was transferring significant company funds into his personal accounts without a legitimate business purpose. As early as 2016, Umpqua was aware of numerous transfers requested to be made to Chris Christensen's personal account. In 2020, Chris Christensen requested large transfers (*i.e.,* one in the amount of $150,000 and another in the amount of $250,000) into his personal accounts from iCap Investments. On May 3, 2021, Chris Christensen advised Tzekov via email that he "need[ed] to transfer funds from the iCap Realty account to my personal account" and that he would "need to do this more in the future as well," requesting from Tzekov a mechanism to accomplish these transfers "more easily," noting that "it would be nice to set it up so I could do the transfers online." On January 21, 2022, Chris Christensen requested wires of $292,125 and $99,000 into his personal accounts.

147.    Umpqua was aware that Chris Christensen used investor funds to purchase a vacation home. On January 27, 2016, Chris Christensen transferred $450,000 from investment fund iCap Pacific NW Management to Oceanaire – the entity that owned his vacation property – and then wired $469,122.96 to First American Title Company for the purchase of his vacation property noting the borrower as Oceanaire.

148.    Umpqua knew there was no legitimate business purpose for the transfer of Investor funds to Chris Christensen's personal account. Umpqua did nothing to stop those transfers. Rather, Umpqua consistently enabled these transfers throughout its relationship with Chris Christensen.

COMPLAINT - 38

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

iv.    **Umpqua's Substantial Assistance to the Ponzi Scheme**

149.    Despite its actual knowledge of the iCap Entities' Ponzi scheme, Umpqua made the conscious decision to substantially assist the fraud in numerous ways.

a.    **Umpqua Did Not End iCap's Banking Services**

150.    Umpqua did not shut down its banking relationship with iCap when it learned of the fraud, thereby permitting the Ponzi scheme to be perpetrated for many years.

151.    Other banks who knew far less than Umpqua determined they could not provide banking services for iCap: upon conducting diligence into iCap, Chase Bank determined that it would be unable to provide the necessary oversight to stay compliant with the regulatory requirements and declined to take on iCap's accounts. The Christensens did not inform Umpqua that they had been rejected as clients by Chase but rather attempted to utilize Chase's preliminary proposal (even after Chase had withdrawn it) to iCap's benefit in the form of reduced fees. Rather than reconsider their banking relationship with iCap, Umpqua went into overdrive to retain the iCap Entities as banking clients, as detailed above.

152.    Umpqua's affirmative decision to continue to generate lucrative banking fees rather than shut down an enterprise it knew to be a fraud resulted in hundreds of millions of dollars in losses suffered by the Investors.

b.    **Umpqua Facilitated Fraudulent Money Transfers**

153.    Umpqua knew that keeping the iCap Entities afloat required shuffling funds, including Investor funds, among the various Entities and Funds. Umpqua repeatedly helped the Christensens shuffle funds among accounts, including covering negative balances when entities within the iCap enterprise had insufficient funds.

154.    For example, on February 25, 2022, Tzekov alerted the Christensens that an account would be overdrawn in the morning and further suggested that the Christensens transfer funds to cover the insufficiency. Specifically, Tzekov emailed the Christensens and others at iCap to inform them that a $97,000.82 check from Fund 4 was "presented for payment last night, but there were not enough funds to cover it. I can still push it through for payment this morning, but would you

COMPLAINT - 39

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

please let me know what account to transfer funds from to cover it?" iCap's Accounting Manager Tatiana Pantchenko replied to Tzekov alerting her that she submitted a transfer of $6,500 "from Equity just now." Tzekov replied: "Thank you!"

155. Similarly, on April 5, 2022, Tzekov sent an email to iCap personnel to inform them that a $20,000 payment "to [iCap Investor] pushed the account into NSF status . . . if you are able to transfer before 10:00am . . . I can pay the items." iCap's Senior Accountant, Vera Rohlfing, emailed the Christensens (copying Tzekov) requesting a transfer from Fund 3 to Fund 2 to "avoid [the] NSF situation."

156. Umpqua repeatedly helped the Christensens divert iCap funds, including Investor funds, to themselves for personal use. Moreover, these transfers were not implemented by the Christensens on their own – Umpqua actively and "happily" processed the requests.

157. For example, on May 3, 2021, Chris Christensen advised Tzekov that he "need[ed] to transfer funds from the iCap Realty account to my personal account" and that he would "need to do this more in the future as well," requesting from Tzekov a mechanism to accomplish these transfers "more easily," noting that "it would be nice to set it up so I could do the transfers online."

158. Tzekov stated in reply that same day: "[w]e can process these transfers to your personal account when you need them; you just let me know when and how much." Tzekov further offered "to check with [the Treasury Management team] and see what would be the easiest way for you to do the transfers yourself."

159. On January 21, 2022, Chris Christensen requested wires of $292,125 and $99,000 into his personal accounts, to which Tzekov replied that she was "happy to assist."

c.    **Umpqua Failed to Further Investigate Red Flags**

160. Umpqua had actual knowledge of fraudulent activities on the part of the iCap Entities and the Christensens, as detailed above. Umpqua also conducted several investigations over the course of the banking relationship. Yet Umpqua repeatedly failed to escalate those concerns, both internally and externally. In fact, it appears that Umpqua employees filled out forms

COMPLAINT - 40

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

incorrectly in order to cause an iCap Entity or Chris Christensen to evade additional scrutiny or pushed back on standard AML requests.

161.    As a result of Umpqua classifying iCap as a "High Risk" customer, Umpqua conducted enhanced due diligence with respect to various iCap Entities in 2021, 2022 and 2023, and drafted at least *seventeen* Enhanced Due Diligence Review reports on iCap transactions that were flagged by Umpqua's monitoring systems, some of which occurred within mere days of one another.

162.    However, none of these Reviews appears to have resulted in any reporting to law enforcement or regulatory agencies. Instead, Umpqua each time ultimately concluded each Review with a recommendation to: "[c]ontinue to monitor [iCap/Christensen] via Umpqua Bank's internal systems. This is due to no AML or BSA related concerns, and the account activity is in line with the customers normal banking history as a real estate investment business." However, iCap's activity was neither normal nor in line with the business of a real estate investment firm, as Umpqua knew.

163.    In the only detailed investigation Umpqua ever appears to have conducted, Umpqua concluded in 2020 that certain of iCap's banking activities were "out of pattern for an investment firm." In its 90-day review with respect to suspicious activity within the iCap accounts, Umpqua prepared an Investigations Worksheet covering the period of 7/29/20 – 12/11/2020, noting:

> The account is primarily funded via ACH, wire, and check deposits, however there was approximately $400k in cash deposits during the review period as well. One cash deposit was matched by a same day outgoing international wire to [individual Investor] for $100,000.00, which may be related or coincidental. ***The cash deposits do appear out of pattern for an investment firm***. . . At this time the customer was not able to provide a clear source for the cash deposits. (Emphasis added).

This 2020 investigation appears to be the *only* time Umpqua recommended a "filing on the [transaction]."

164.    Umpqua was required to file Currency Transaction Reports (or CTRs) with the Financial Crimes Enforcement Network (FinCEN) for each cash deposit, withdrawal, exchange of

COMPLAINT - 41

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

currency, or other payment or transfer, by, through, or to the financial institution which involved a transaction in currency valued at more than $10,000 for the purpose of detecting money laundering, tax evasion, and other illegal activities.

165. The instructions to FinCEN Form 104 (the CTR form) state as follows: "If a transaction is suspicious and in excess of $10,000 in currency, then both a CTR and the appropriate Suspicious Activity Report form must be filed. In situations involving suspicious transactions requiring immediate attention, such as when a reportable transaction is ongoing, the financial institution shall immediately notify, by telephone, appropriate law enforcement and regulatory authorities in addition to filing a timely suspicious activity report."

166. Prior to the filing of this Complaint, discovery was obtained from Umpqua pursuant to Bankruptcy Rule 2004. While Umpqua produced a number of documents, it did not produce any CTRs or other evidence of reporting to law enforcement or regulatory agencies beyond the reference in the 2020 investigation, which recommending a filing.

167. While Umpqua did not report the Ponzi scheme to law enforcement, or regulatory agencies, certain Umpqua employees assisted iCap by incorrectly filling out forms in an effort to avoid additional internal diligence. For example, in 2019, an Umpqua employee filled out an application for an iCap Entity to be able to implement "Remote Deposit Capture Service", which required approval. The form notes that "exception approval" is required if certain answers are "Yes." Umpqua filled out the form to state that the customer was not a "Higher Risk Line of Business as defined in UBGC 210.3.2" and that it had not had three or more overdrafts. While the reference is unknown at this time to Plaintiffs, it is likely that the iCap Entities met the definition of a "Higher Risk Line of Business." And if various iCap accounts did not have three or more overdrafts, that is likely due to Tzekov's constant intervention to prevent overdrafts. Umpqua and Tzekov regularly provided cover for the Ponzi scheme.

168. Umpqua substantially assisted the Christensens' fraud, misuse, and misappropriation of Investor funds throughout their banking relationship. Umpqua did this by accepting Investor deposits, allowing iCap's commingled accounts to remain open, and by

COMPLAINT - 42

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

continuing to process thousands of transfers and transactions involving the deposit and disbursement of Investor funds within Fund accounts and Chris Christensen's personal accounts totaling tens of millions of dollars. The Christensens' scheme could not have continued without Umpqua's substantial assistance.

169.    Umpqua knowingly pursued its business objectives of maximizing deposits and all related transactions and generating substantial fees, charges, interest, and other forms of revenue while innocent Investor victims were losing hundreds of millions of dollars on account of the Christensens' Ponzi scheme.

170.    Umpqua's knowing and substantial assistance to the Christensens and their iCap Entities in running a Ponzi scheme has caused hundreds of millions of dollars of damages to iCap's Investor victims.

v.    **Umpqua Had Knowledge of and Substantially Assisted the Christensens' Breach of Fiduciary Duties**

171.    Through its multi-year banking relationship with the iCap Entities and Chris Christensen, Umpqua, at all relevant times, knew the nature of iCap's business, including that Chris Christensen and Jim Christensen solicited and accepted investments, and that they owed their Investors a fiduciary duty to act with the utmost good faith and in the best interests of those Investors.

172.    Umpqua also knew that Chris Christensen and Jim Christensen were breaching their fiduciary duties. Umpqua learned of iCap's Ponzi scheme in the course of performing its customer due-diligence obligations. Yet instead of exposing the Ponzi scheme, Umpqua substantially assisted Chris Christensen and Jim Christensen in perpetrating the scheme, thus breaching their fiduciary duties to Investors.

## FIRST CAUSE OF ACTION

### (Aiding and Abetting Fraud)

173.    Plaintiffs repeat and reallege the factual allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

COMPLAINT - 43

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

174.    Umpqua possessed actual knowledge over a consecutive period of years that:

a.    Accounts at Umpqua held Investors' deposits and that Investors believed they were investing in a legitimate real estate investment business;

b.    iCap's bank accounts at Umpqua were regularly at a deficit balance and were frequently overdrawn and that iCap would shuffle funds from other accounts – including accounts that it knew contained new Investor money – to cover the deficits, overdrafts, and obligations to existing Investors;

c.    The vast majority of funds deposited by the iCap Entities into their Umpqua bank accounts came from Investors, intercompany transfers, and external lenders, rather than being generated through business operations;

d.    Withdrawals from the iCap Entities' accounts were not used to fund investments as represented to Investors and that the vast majority of withdrawals were paid out as returns to Investors and intercompany transfers;

e.    iCap's banking activities were "out of pattern for an investment firm" as a result of Umpqua's 90-day review of iCap accounts in 2020 with respect to suspicious activity within the iCap accounts;

f.    iCap's reported losses on its taxes were incompatible with Chris Christensen's receipt of funds from iCap, Umpqua having sought "a written explanation from the customer on how his business operates as the ordinary income for these businesses is showing huge losses in the millions but he is pulling a salary and or guaranteed payment";

g.    iCap was shuffling and commingling Investor funds within its accounts at Umpqua such that the funds were effectively pooled in one common fund;

h.    Chris Christensen was transferring significant Investor funds into his personal accounts without a legitimate business purpose; and

i.    Chris Christensen used Investors' funds to purchase a vacation home; on January 27, 2016, Chris Christensen transferred $450,000 from investment fund iCap Pacific NW Management to Oceanaire – the entity that owned his vacation property and then wired $469,122.96 to First American Title Company for the purchase of his vacation property noting the borrower as Oceanaire.

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

175.    Umpqua knew that this conduct on the part of the Christensens and the iCap Entities constituted a Ponzi scheme that defrauded the Investors.

176.    However, Umpqua willfully disregarded these highly improper financial practices involving Investor funds and provided substantial assistance to the Ponzi scheme by:

a.    Not shutting down iCap's banking relationship when it learned of the fraud, thereby permitting the Ponzi scheme to be perpetrated for many years;

b.    Helping the Christensens shuffle funds among accounts, including covering negative balances, when entities within the iCap enterprise had insufficient funds by alerting iCap when a transaction would result in insufficient funds and suggesting that iCap make a transfer to cover the insufficiency;

c.    Helping the Christensens divert iCap funds, including Investor funds, to themselves for personal use by processing such transfer requests;

d.    Working to add a mechanism to iCap's online banking platform to enable Chris Christensen to transfer funds to his personal account from the iCap accounts;

e.    Failing to communicate the concerns generated by its investigations to regulatory agencies and law enforcement; and

f.    Filling out forms incorrectly in order to cause an iCap Entity or Chris Christensen to evade additional scrutiny or pushing back on standard AML requests.

177.    The Ponzi scheme orchestrated and conducted by the Christensens and the iCap Entities would not have occurred or continued, but for Umpqua's knowing and substantial assistance, enabling, aid, encouragement and facilitation.

178.    As a direct and proximate result of Umpqua's aiding and abetting the Ponzi scheme orchestrated and continuously conducted by the Christensens and the iCap Entities over a period of years, the Investors have been damaged to the full extent of their lost investments.

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

## SECOND CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty)

179.    Plaintiffs repeat and reallege the factual allegations contained in each preceding paragraph of the Complaint as though fully set forth herein.

180.    Chris Christensen and Jim Christensen owed the Investors fiduciary duties of loyalty, care, and to deal honestly and in good faith, which they breached by selling the Investors promissory notes and fund offerings, and soliciting and accepting investments pursuant to false offering materials and other material misrepresentations, and by misappropriating, commingling, and otherwise misusing Investors' funds, and continuing to misrepresent material facts about the iCap Entities and their funds.

181.    Umpqua, through its multi-year banking relationship with the iCap Entities and Chris Christensen, at all relevant times, knew the nature of iCap's business, including that Chris Christensen and Jim Christensen solicited and accepted investments, and that they owed their Investors a fiduciary duty to act with the utmost good faith and in the best interests of those Investors. Having reviewed the relevant Fund documents, Umpqua was well aware of the fact that the iCap Entities and their various investment vehicles and investment managers were structured to afford complete discretion to Chris Christensen and the iCap fund managers with respect to the specific types of real estate in which Investor funds would be placed, the timing for all such investments, the decisions regarding when each parcel would be sold, and how each would be appraised and priced for sale. Umpqua knew the Investors had, therefore, placed a substantial amount of trust in the iCap Entities and their principals, Chris and Jim Christensen, as fiduciaries of their investments.

182.    Umpqua also knew that Chris Christensen and Jim Christensen were breaching their fiduciary duties.

183.    As previously alleged, Umpqua learned of iCap's Ponzi scheme in the course of performing its customer due-diligence obligations. Yet instead of exposing the Ponzi scheme,

COMPLAINT - 46

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

Umpqua substantially assisted Chris Christensen and Jim Christensen in perpetrating the scheme, thus breaching their fiduciary duties to Investors.

184.    Umpqua possessed actual knowledge over a consecutive period of years that:

a.    Accounts at Umpqua held Investors' deposits and that Investors believed they were investing in a legitimate real estate investment business;

b.    iCap's bank accounts at Umpqua were regularly at a deficit balance and were frequently overdrawn and that iCap would shuffle funds from other accounts – including accounts that it knew contained new Investor money – to cover the deficits, overdrafts, and obligations to existing Investors;

c.    The vast majority of funds deposited by the iCap Entities into their Umpqua bank accounts came from Investors, intercompany transfers, and external lenders, rather than being generated through business operations;

d.    Withdrawals from the iCap Entities' accounts were not used to fund investments as represented to Investors and that the vast majority of withdrawals were paid out as returns to Investors and intercompany transfers;

e.    iCap's banking activities were "out of pattern for an investment firm" as a result of Umpqua's 90-day review of iCap accounts in 2020 with respect to suspicious activity within the iCap accounts;

f.    iCap's reported losses on its taxes were incompatible with Chris Christensen's receipt of funds from iCap, Umpqua having sought "a written explanation from the customer on how his business operates as the ordinary income for these businesses is showing huge losses in the millions but he is pulling a salary and or guaranteed payment";

g.    iCap was shuffling and commingling Investor funds within its accounts at Umpqua such that the funds were effectively pooled in one common fund;

h.    Chris Christensen was transferring significant Investor funds into his personal accounts without a legitimate business purpose; and

i.    Chris Christensen used Investors' funds to purchase a vacation home; on January 27, 2016, Chris Christensen transferred $450,000 from investment fund iCap Pacific NW Management to Oceanaire – the entity that owned his vacation property and then wired

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

$469,122.96 to First American Title Company for the purchase of his vacation property noting the borrower as Oceanaire.

185. Umpqua knew that this conduct on the part of the Christensens and the iCap Entities constituted a Ponzi scheme that defrauded the Investors, in violation of the Christensens' fiduciary duties to the Investors.

186. However, Umpqua willfully disregarded these highly improper financial practices involving investor funds and provided substantial assistance to the Ponzi scheme by:

    a.    Not shutting down iCap's banking relationship when it learned of the fraud, thereby permitting the Ponzi scheme to be perpetrated for many years;

    b.    Helping the Christensens shuffle funds among accounts, including covering negative balances when entities within the iCap enterprise had insufficient funds by alerting iCap when a transaction would result in insufficient funds and suggesting that iCap make a transfer to cover the insufficiency;

    c.    Helping the Christensens divert iCap funds, including Investor funds, to themselves for personal use by processing such transfer requests;

    d.    Working to add a mechanism to iCap's online banking platform to enable Chris Christensen to transfers funds to his personal account from the iCap accounts;

    e.    Failing to communicate the concerns generated by its investigations to regulatory agencies and law enforcement; and

    f.    Filling out forms incorrectly in order to cause an iCap Entity or Chris Christensen to evade additional scrutiny or pushing back on standard AML requests;

187. As a direct and proximate result of Umpqua's aiding and abetting of Chris Christensen's and Jim Christensen's breaches of their fiduciary duties, Investors have been damaged to the full extent of their lost investments.

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the following relief:

A.    An award of compensatory damages in an amount to be determined at trial.

B.    An award of punitive or exemplary damages in an amount to be determined at trial.

C.    Pre-judgment interest and post-judgment interest as permitted by law.

D.    Reasonable attorneys' fees as permitted by law.

E.    Reasonable costs and expenses, including expert fees and all recoverable costs, as permitted by law.

F.    Such other and further relief as the court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby invoke their rights pursuant to the Seventh Amendment of the United States Constitution and the Washington State Constitution and demand a jury trial for all claims so triable.

DATED September 26, 2025

BUSH KORNFELD LLP

/s/ Jason Edward Wax

Jason Edward Wax, WSBA #41944
601 Union Street, Suite 5000
Seattle, WA 98101
Tel.: (206) 292-2110
Facsimile: (206) 292-2104
Email:  jwax@bskd.com

-and-

PACHULSKI STANG ZIEHL & JONES LLP
Alan J. Kornfeld, CA Bar No. 130063
James W. Walker, TX Bar No. 20709600
Cia H. Mackle, FL Bar No. 26471
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003
Tel: (310) 277-6910
Facsimile: (310) 201-0760
Emails: akornfeld@pszjlaw.com,
jwalker@pszjlaw.com, cmackle@pszjlaw.com

*Attorneys for the Plaintiffs, Lance Miller and Seth Freeman as Co-Trustees of the iCap Trust*

COMPLAINT - 49

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910; Facsimile: (310) 201-0760

BUSH KORNFELD LLP
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110; Facsimile (206) 292-2104

LA:4923-5582-1164.1 39502.00002