The Honorable James L. Robart

Jason M. Ayres, WSBA #39141
Tara J. Schleicher, WSBA #26884
**FOSTER GARVEY PC**
1111 Third Avenue, Suite 3000
Seattle, WA  98101
Telephone: (503) 228-3939
Jason.Ayres@foster.com
Tara.Schleicher@foster.com

Keith Ketterling (*pro hac vice*)
Lydia Anderson-Dana (*pro hac vice*)
Madeleine Holmes (*pro hac vice*)
Erin E. Roycroft (*pro hac vice*)
Anuj Shah (*pro hac vice*)
**STOLL STOLL BERNE
LOKTING & SHLACHTER, P.C.**
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
kketterling@stollberne.com
landersondana@stollberne.com
mholmes@stollberne.com
eroycroft@stollberne.com
ashah@stollberne.com

*Counsel for Defendant Columbia
Bank*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| Lance Miller and Seth Freeman as Co-Trustees of the iCap Trust,<br><br>Plaintiffs,<br><br>v.<br><br>Columbia Bank f/k/a Umpqua Bank,<br><br>Defendant. | Case No. 2:25-cv-01870-JLR<br><br>**MOTION TO DISMISS**<br><br>NOTE ON MOTION CALENDAR: March 6, 2026<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF THE FACTS ........................................................................... 1

    A.      The Alleged iCap Ponzi Scheme ........................................................... 1

    B.      The Christensens' Alleged Breaches of Fiduciary Duty ........................ 2

    C.      Columbia's Banking Relationship with iCap .......................................... 2

    D.      The iCap Bankruptcy .............................................................................. 3

    E.      Plaintiffs' Claims .................................................................................... 3

III.    LEGAL STANDARDS ......................................................................................... 4

    A.      Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Rule 12(b)(1) .............. 4

    B.      Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim ................. 4

    C.      Rule 9(b) Pleading Standard ................................................................... 4

IV.     ARGUMENT ........................................................................................................ 5

    A.      The Trustees Lack Standing to Bring Claims on Behalf of All "Investors" and Any Such Claims Should Be Dismissed ........................................ 5

    B.      Plaintiffs' Claims Are Inadequately Pled Because Plaintiffs Fail to Identify the Assigning Investors ................................................................ 6

    C.      Plaintiffs' Claim for Aiding and Abetting Fraud Must Be Dismissed .................. 7

        i.      Plaintiffs Fail to Allege iCap's Primary Liability for Fraud With Particularity ................................................................ 8

        ii.      Plaintiffs Fail to Allege Columbia's Actual Knowledge of the Alleged Ponzi Scheme ............................................. 10

            a.      Plaintiffs Fail to Plead the Necessary Elements to Show Actual Knowledge of a Ponzi Scheme ................ 10

            b.      Plaintiffs' Theory of Actual Knowledge Lacks Factual Support ............. 12

        iii.      Plaintiffs Fail to Allege Columbia's Substantial Assistance to the Alleged Ponzi Scheme ............................................. 15

D.    Plaintiffs' Claim for Aiding and Abetting Breach of Fiduciary Duty Must Be Dismissed ........................................................................................................ 17

    i.    Plaintiffs Fail to Adequately Allege iCap's Primary Liability for Breach of Fiduciary Duty ............................................................................ 17

        a.    Plaintiffs Fail to Allege the Existence of a Fiduciary Duty ................... 18

        b.    Plaintiffs Fail to Allege Breach With Particularity ................................. 19

    ii.    Plaintiffs Fail to Allege Columbia's Secondary Liability for Breach of Fiduciary Duty ....................................................................... 20

        a.    Plaintiffs Fail to Allege Actual Knowledge of Any Fiduciary Duty ........ 20

        b.    Plaintiffs Fail to Allege Columbia's Actual Knowledge of or Substantial Assistance to Any Breach of Fiduciary Duty ....................... 21

V.    CONCLUSION ........................................................................................................ 22

Case No. 2:25-cv-01870

# TABLE OF AUTHORITIES

**Cases**

*Adams v. King Cnty.*
   164 Wash. 2d 640 (2008) ............................................................................................................... 8

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009) ...................................................................................................................... 4

*Bell Atl. Corp. v. Twombly*
   550 U.S. 544 (2007) ...................................................................................................................... 4

*Brashkis v. Hyperion Cap. Grp., LLC*
   No. 3:11-cv-05635 RBL, 2011 WL 6130787 (W.D. Wash. Dec. 8, 2011) ................................. 8

*Cafasso v. Gen. Dynamics C4 Sys., Inc.*
   637 F.3d 1047 (9th Cir. 2011) ............................................................................................... 4, 19

*Casey v. U.S. Bank Nat. Assn.*
   127 Cal. App. 4th 1138 (2005) ................................................................................................... 15

*Chandler v. State Farm Mut. Auto. Ins. Co.*
   598 F.3d 1115 (9th Cir. 2010) ..................................................................................................... 4

*Concha v. London*
   62 F.3d 1493 (9th Cir. 1995) ....................................................................................................... 5

*Cotton v. Wells Fargo Bank N.A.*
   No. SACV 10-01758-CJC(RNBx), 2011 WL 13227816 (C.D. Cal. Feb. 22, 2011) ............... 22

*Cunningham v. Brown*
   265 U.S. 1 (1924) ......................................................................................................................... 9

*El Camino Res., LTD. v. Huntington Nat. Bank*
   722 F. Supp. 2d 875 (W.D. Mich. 2010) ............................................................................. 15, 17

*Huang v. Hong Kong & Shanghai Banking Corp. LTD*
   No. 1:20-cv-03548-LTS-SN, 2022 WL 4123879 (S.D.N.Y. 2022) ...................................... 15, 16

*In re Agape Litigation*
   681 F. Supp. 2d 352 (E.D.N.Y. 2010) ................................................................................. 15, 21

*In re Agric. Research & Tech. Grp., Inc.*
   916 F.2d 528 (9th Cir. 1990) ................................................................................................. 9, 10

*In re Century Aluminum Co. Sec. Litig.*
   729 F.3d 1104 (9th Cir. 2013) ................................................................................................... 11

*In re Consol. Meridian Funds*
    485 B.R. 604 (Bankr. W.D. Wash. 2013) ..................................................................passim

*In re EPD Inv. Co., LLC*
    114 F.4th 1148 (9th Cir. 2024) ....................................................................................9, 14

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
    Nos. M 07–1827 SI, C 09–1115 SI, 2009 WL 4874872 (N.D. Cal. Oct. 6, 2009) ..............7

*La. Farmers' Protective Union v. Great Atl. & Pac. Tea Co. of Am.*
    131 F.2d 419 (8th Cir. 1942) ................................................................................................7

*Liebergesell v. Evans*
    93 Wash. 2d 881 (1980) ......................................................................................................18

*Martin v. Abbott Labs.*
    102 Wash. 2d 581 (1984) ................................................................................................7, 15

*Matter of Est. of Ridley*
    195 Wash. App. 1001 (2016) ..............................................................................................14

*Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP*
    110 Wash. App. 412 (2002) ................................................................................................18

*Miller v. U.S. Bank of Wash.*
    72 Wash. App. 416 (1994) ..................................................................................................18

*Moon v. Phipps*
    67 Wash.2d 948 (1966) .......................................................................................................18

*Moss v. U.S. Secret Serv.*
    572 F.3d 962 (9th Cir. 2009) ................................................................................................4

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*
    930 A.2d 92 (Del. 2007) .......................................................................................................9

*Pereira v. United Jersey Bank, N.A.*
    201 B.R. 644 (S.D.N.Y. 1996) ...........................................................................................16

*Perkumpulan Inv. Crisis Ctr. Dressel-WBG v. Wong*
    No. C09-0526-JCC, 2009 WL 10676449 (W.D. Wash. Oct. 30, 2009) ..........................5, 18

*Quadrant Structured Prods. Co. v. Vertin*
    115 A.3d 535 (Del. Ch. 2015) ..............................................................................................9

*Sec. & Exch. Comm'n v. Fuhlendorf*
    No. C09-1292 MJP, 2010 WL 11500146  (W.D. Wash. Mar. 19, 2010)...........................5, 10

*Sherlock Invs.-Duvall LLC v. Intercoastal Auto Brokers & Logistics, LLC*
    No. 2:20-cv-00129-RAJ-BAT, 2020 WL 729066 (W.D. Wash. Apr. 7, 2020)....................13

*Starr v. Baca*
    652 F.3d 1202 (9th Cir. 2011) ................................................................................4

*Superpumper, Inc. v. Leonard, Tr. for Bankr. Est. of Morabito*
    137 Nev. 429 (2021) ..............................................................................................7

*Swartz v. KPMG LLP*
    476 F.3d 756 (9th Cir. 2007) ..................................................................................5

*Turner v. City & Cty. of San Francisco*
    788 F.3d 1206 (9th Cir. 2015) ................................................................................4

*Vess v. Ciba-Geigy Corp. USA*
    317 F.3d 1097 (9th Cir. 2003) ..........................................................................8, 19

*Westview Invs., Ltd. v. U.S. Bank*
    133 Wash. App. 835 (2006) ....................................................................................8

*Zazzali v. Eide Bailly LLP*
    No. 1:12-CV-349-S-MJP, 2013 WL 6045978 (D. Idaho Nov. 14, 2013)................6

**Statutes and Rules**

Fed. R. Civ. P. 12(b)(1) ..............................................................................................1, 4

Fed. R. Civ. P. 12(b)(6) ..............................................................................................1, 4

Fed. R. Civ. P. 8 .........................................................................................................4, 14

Fed. R. Civ. P. 9(b) .................................................................................................passim

RCW § 30A.22.090 .........................................................................................................13

RCW § 30A.22.120 ..........................................................................................13, 14, 16

RCW § 30A.22.220 ...........................................................................................................13

**Regulations**

12 C.F.R. § 21.11(k) ........................................................................................................17

12 C.F.R. § 353.3(g) ........................................................................................................17

**Other Authorities**

6A Fed. Prac. & Proc. Civ. § 1545 (3d ed.) ...................................................................5

*Commingling*, Black's Law Dictionary (12th ed. 2024) .........................................13

FFIEC BSA/AML Manual, "Risks Associated with Money Laundering and Terrorist Financing ........14

Jim Milliot, "Online Sales Stall at Amazon, More Layoffs Coming," *Publisher's Weekly* (Feb. 3, 2022) ...................................................................................................................9

Restatement (Third) of Torts: Economic Harms § 28 ....................................16, 17

I.    **INTRODUCTION**

Plaintiffs Lance Miller and Seth Freeman, as Co-Trustees of the iCap Trust ("Plaintiffs") bring this case on behalf of an unnamed number of investors against Defendant Columbia Bank ("Columbia"), alleging that Columbia aided and abetted an alleged Ponzi scheme and breaches of fiduciary duties perpetrated by non-parties iCap Enterprises, Inc. (collectively with related entities, "iCap"), Chris Christensen, and Jim Christensen.  Plaintiffs' claims fail because: 1) Plaintiffs have not established standing under Rule 12(b)(1) for the Plaintiffs as assignees; 2) Plaintiffs have failed to state a claim under Rule 12(b)(6) for the Investors who assigned their claims; 3) Plaintiffs' claims for aiding and abetting fraud fail to state a claim under Rule 12(b)(6) for primary or secondary liability; and 4) Plaintiffs' claims for aiding and abetting breach of fiduciary duty fail to state a claim under Rule 12(b)(6) for primary or secondary liability.  For these reasons, Columbia asks that the Court dismiss the Complaint with prejudice.

II.    **STATEMENT OF THE FACTS**

A.    **The Alleged iCap Ponzi Scheme**

Chris Christensen formed iCap Enterprises, Inc. in 2007, and its direct subsidiary, iCap Equity, LLC in 2011, as real estate investment vehicles.  ECF No. 1 ("Compl."), ¶ 21.  iCap was based in Bellevue, Washington, and employed over 35 people by early 2023.  *Id.* ¶¶ 21–22.  As iCap expanded, it grew to include at least 31 related entities.  *Id.* ¶ 1 n. 1.  However, investors directly invested into only six of these entities: iCap Pacific Northwest Opportunity and Income Fund, LLC ("Fund 1"); iCap Northwest Opportunity Fund, LLC ("Fund 2"), iCap Equity, LLC ("Fund 3"), iCap Funding, LLC ("iCap Funding"); iCap Investments, LLC ("iCap Investments"); and iCap Vault 1, LLC ("Vault 1"). *Id.* ¶¶ 33, 45.  iCap "rais[ed] approximately $230 million from over 1,800 investors in the United States and abroad." *Id.* ¶ 99.  Fund 1 "achieve[d] 12% distributions in excess of investments," while the other funds "returned less than the original investments."  *Id.* ¶ 95.

Plaintiffs allege that Chris Christensen and his brother, Jim Christensen, operated a Ponzi scheme through iCap, but have contradictory allegations about when the scheme began and which

investment entities it encompassed.[1]  *Id.* ¶ 56.  The Complaint details the following "hallmarks of a Ponzi scheme" present at iCap: 1) and 2) the "vast majority" of deposits and withdrawals went to and from investors or were intercompany transfers; 3) and 4) iCap's real estate business made little money and did not generate enough revenue to meet obligations to investors; 5) iCap engaged in intercompany transfers and commingling; 6) iCap's payments to investors required "unrealistic returns"; and 7) other "hallmarks" (iCap did not invest funds in the promised investments, earlier investors received higher returns than later investors, and iCap sought bankruptcy protection).  *Id.* ¶¶ 44–99.

Plaintiffs assert the Christensens solicited investments based on "false and misleading assurances about the security, profitability, and liquidity" of iCap, when, in reality, funds from new investors were used to pay existing investors.  *Id.* ¶ 8.

**B.    The Christensens' Alleged Breaches of Fiduciary Duty**

The Christensens "exercised sole and exclusive discretion" over investment decisions, iCap's business, and sending financial information to investors.  *Id.* ¶ 28.  In soliciting investors, the Christensens presented themselves to investors as "investment professionals" with "extensive experience."  *Id.* ¶¶ 30–31.  They assured investors that they were "looking out for the Investors' best interests."  *Id.* ¶ 33.  The Complaint specifically alleges that, during five investor calls between November 2020 and March 2023, Chris Christensen told investors or their advisers that iCap wanted to sell the investors "unique investment[s]" and would offer "good communication" to "take care" of investors.  *Id.*  Those representations "caused the Investors to feel safe and secure in their decisions to invest with" iCap, and, in turn, "relax[] their care and vigilance[.]"  *Id.* ¶ 34.

**C.    Columbia's Banking Relationship with iCap**

iCap began its banking relationship with Umpqua Bank (which later merged with Columbia

---

[1] *Compare* Compl. ¶¶ 8, 102–04, 106 (allegations of fraud from as early as 2013), *with id.* ¶¶ 56, 67, 98–99 (alleging the fraud began "no later than October 2018"); *see also id.* ¶ 95 (alleging Fund 1 made distributions of 12% more than investments); *id.* ¶ 52 (alleging the business was profitable between September 2013 and December 2020).

Case No. 2:25-cv-01870

Bank) in 2013.[2]  *Id.* ¶ 106.  Plaintiffs allege that Columbia gained knowledge of iCap's business operations by complying with federal regulatory requirements; maintaining a business relationship with Chris Christensen; determining that some of the entities were "High-Risk" and conducting Enhanced Due Diligence Reviews; and reviewing some of the entities' operating agreements, financial statements, and tax returns.  *Id.* ¶¶ 120–27.  Plaintiffs also assert that the following alleged facts collectively demonstrate Columbia's actual knowledge of iCap's Ponzi scheme: Columbia alerted iCap to overdrawn accounts and negative balances; Columbia purportedly knew that most deposit and withdrawal activity were related to payments to and from investors as well as intercompany transfers; one investigations worksheet opined that iCap's cash deposits were "out of pattern for an investment firm"; Columbia declined to extend a home loan to Chris Christensen; and Columbia facilitated transactions from corporate to personal accounts.  *Id.* ¶¶ 135–42, 146–48.

### D.    The iCap Bankruptcy

On September 29, 2023, iCap filed for Chapter 11 bankruptcy.  *Id.* ¶ 97.  In October 2024, the Bankruptcy Court approved a liquidation plan.  Compl. ¶¶ 15, 97; *see* Declaration of Lydia Anderson-Dana in Support of Defendant's Motion to Dismiss ("Anderson-Dana Decl."), Ex. A (the "Plan"), Ex. B ("Confirmation Order").  The Plan and the Confirmation Order authorized the iCap Trust, Plaintiffs here, to bring "iCap Trust Actions" on behalf of "itself, the Debtors, the Estates, and the Contributing Claimants."  Plan, art. V.D.15; *see also* Confirmation Order, ¶¶ 86, 107.

### E.    Plaintiffs' Claims

On September 26, 2025, Plaintiffs filed a complaint against Columbia.  Plaintiffs allege that Columbia aided and abetted the Christensens' fraud and breach of fiduciary duty because Columbia had actual knowledge that the Christensens were operating a Ponzi scheme and made a conscious decision to substantially assist it by, among other things, failing to terminate iCap's banking.  Compl. ¶¶ 176, 186.  Plaintiffs do not state a specific demand for damages or state which investors or how many investors have assigned their claims to Plaintiffs.

---

[2] The Complaint refers to Columbia by its former name, Umpqua Bank.  Quotations herein do not change the Complaint's nomenclature, but this Motion otherwise generally refers to Columbia Bank as "Columbia."

III.    **LEGAL STANDARDS**

A.    **Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Rule 12(b)(1)**

"The Article III case or controversy requirement limits federal courts' subject matter jurisdiction by requiring, inter alia, that plaintiffs have standing[.]" *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121 (9th Cir. 2010). "The party asserting federal subject matter jurisdiction bears the burden of proving its existence." *Id.* at 1122. "Standing addresses whether the plaintiff is the proper party to bring the matter to the court for adjudication." *Id.*

B.    **Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim**

To defeat a Rule 12(b)(6) motion, a complaint generally must allege "sufficient factual matter" to state a claim that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S at 678; *see also* Fed. R. Civ. P. 8. In assessing the adequacy of the complaint, the Court must accept all pleaded facts as true. *Turner v. City & Cty. of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015). However, "[t]o be entitled to a presumption of truth, allegations in a complaint . . . must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Thus, "for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

C.    **Rule 9(b) Pleading Standard**

Fraud-based claims are subject to Rule 9(b)'s heightened pleading standard. Rule 9(b) requires parties to plead such claims with specificity, including claims that sound in fraud and allegations of fraudulent conduct, alleging the "who, what, when, where, and how of the misconduct charged." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011). More specifically, "a plaintiff must identify 'the time, place, and specific content of the false representations as well as the

1  identities of the parties to the misrepresentations.'" *Sec. & Exch. Comm'n v. Fuhlendorf*, No. C09-

2  1292 MJP, 2010 WL 11500146, at *4 (W.D. Wash. Mar. 19, 2010) (quoting *Swartz v. KPMG LLP*, 476

3  F.3d 756, 764 (9th Cir. 2007)).  "The purpose of this rule is to ensure that defendants accused of the

4  conduct specified have adequate notice of what they are alleged to have done, so that they may defend

5  against the accusations" because "[w]ithout such specificity, defendants in these cases would be put to

6  an unfair disadvantage, since at the early stages of the proceedings they could do no more than

7  generally deny any wrongdoing."  *Concha v. London*, 62 F.3d 1493, 1502 (9th Cir. 1995).

8  ## IV.    ARGUMENT

9
10  ### A.    The Trustees Lack Standing to Bring Claims on Behalf of All "Investors" and Any Such Claims Should Be Dismissed

11         An assignee of a claim has standing only if "the plaintiff-assignee is the real party in interest

12  with regard to the particular claim involved in the action" and "a valid assignment has been made."  6A

13  Fed. Prac. & Proc. Civ. § 1545 (3d ed.).  Although post-confirmation trustees in bankruptcy, such as

14  Plaintiffs here, generally have standing to pursue such claims on behalf of the investors who assign

15  those claims to a post-confirmation trust, non-assigning investors retain their claims.  *See In re Consol.*

16  *Meridian Funds*, 485 B.R. 604, 612 (Bankr. W.D. Wash. 2013) ("*Meridian Funds*") ("In the case of a

17  *Ponzi* scheme, investors have a claim that is particularized as to them and they have the exclusive right

18  to pursue the claims."); *Perkumpulan Inv. Crisis Ctr. Dressel-WBG v. Wong*, No. C09-0526-JCC, 2009

19  WL 10676449, at *7 (W.D. Wash. Oct. 30, 2009), *aff'd*, 395 F. App'x 442 (9th Cir. 2010) (concluding

20  that an investor organization had failed to establish assignee standing in a Ponzi scheme case, in part,

21  because "Plaintiff has failed to secure assignments from all the investors it claims to represent").

22         To decide the extent of Plaintiffs' standing to bring claims against Columbia, the parties agree

23  that the Court must look to the Plan and related documents.  Compl. ¶ 17.  Under the Plan, the iCap

24  Trust has the authority to bring "iCap Trust Actions" on behalf of "itself, the Debtors, the Estates, and

25  the Contributing Claimants."  Plan, art. V.D.15.  "iCap Trust Actions" are defined as, among other

26  things, "Causes of Action that are contributed to the iCap Trust as Contributed Claims . . . against any

27  Person that is not a Released Party."  *Id.*, art. I.A.62.  "Contributed Claims" are defined as, in part,

28  "[a]ll Causes of Action that a Creditor has against any Person that is not a Released Party and that are

Case No. 2:25-cv-01870

related in any way to the Debtors." *Id.*, art. I.A.28.  And "Contributing Claimants" are "[t]he Creditors that elect on their Ballots to contribute Contributed Claims to the iCap Trust." *Id.*, art. I.A.29.  On those ballots, iCap told investors "**[i]f you elect to not contribute your Contributed Claims to the iCap Trust, you will remain able to pursue such claims (at your own cost and expense) in an appropriate forum.**"  Anderson-Dana Decl., Ex. C ("Ballot") at 321 (emphasis added).

In other words, the iCap Trust, according to the Plan as well as the Complaint itself, has standing to bring claims against Columbia on behalf of **only** those creditors who chose to contribute their claims on their August 2024 ballots.  *See* Plan, art. V.D.15; Compl. ¶ 17 ("Pursuant to the Plan and Trust Agreement, the Trustees have the right to pursue the Contributed Claims on behalf of the assigning Investors.").  But according to the Complaint, "the Trustees seek the recovery of the **Investors'** losses," Compl. ¶ 15 (emphasis added), which Plaintiffs define as the "1,800 investors in the United States and abroad" who invested "approximately $230 million" with the Christensens and iCap. *See also id.* ¶¶ 178, 187 (seeking damages for all "Investors").

To the extent that the Complaint brings claims and alleges damages on behalf of all "Investors," Plaintiffs lack standing as to the non-assigning investors who retain the legal rights to bring such claims, and those claims should be dismissed.[3]

## B.    Plaintiffs' Claims Are Inadequately Pled Because Plaintiffs Fail to Identify the Assigning Investors

Courts have held that defendants are entitled to know, at the pleading stage, at a minimum, the identity of assignors whose claims are being brought.  *Zazzali v. Eide Bailly LLP*, No. 1:12-CV-349-S-MJP, 2013 WL 6045978, at *35 (D. Idaho Nov. 14, 2013) ("Eide Bailly is entitled to know the identity of each assigning investor in the instant action through the pleadings themselves, not a summary declaration attached in opposition to a motion to dismiss."); *see also In re TFT-LCD (Flat Panel)*

---

[3] To the extent the Trustees bring claims on behalf of the Trust itself, the doctrine of *in pari delicto* bars those claims.  *See Meridian Funds*, 485 B.R. at 618 (confirming that the *in pari delicto* doctrine would bar a post-confirmation trustee from bring claims on behalf of entities that were allegedly a Ponzi scheme against a bank "because they bear the same culpability").  Under this doctrine, the allegations of embezzlement, Compl. ¶¶ 100-05, are barred and should be dismissed because the funds on deposit in iCap's accounts belonged to iCap—not investors.  *See* p. 14, *infra*.

1    *Antitrust Litig.*, Nos. M 07–1827 SI, C 09–1115 SI, 2009 WL 4874872, at *4 (N.D. Cal. Oct. 6, 2009);

2    *La. Farmers' Protective Union v. Great Atl. & Pac. Tea Co. of Am.*, 131 F.2d 419, 423 (8th Cir. 1942).

3         But the only mention in the Complaint of the assigning investors is that the Plan and Trust

4    Agreement allows the Trustees to pursue their claims, *see* Compl. ¶ 17, without identifying who those

5    assigning investors are, their number, when they invested, which iCap funds they invested in, or any

6    other critical detail.  This leaves Columbia in the dark on what claims are being pursued and certainly

7    does not comport with Rule 9(b).  Given the nature of the allegations against Columbia, which involve

8    anywhere from 6 to 31 investment funds[4] and span 10 years of investments, Columbia is entitled to

9    know significantly more information via the pleadings about the investors, such as: 1) the identity of

10   the assigning investors; 2) which investments each assigning investor made in iCap; 3) when those

11   investments were made; 4) what the fraud is as to investments; and 5) where each investor lives.

12   Without that information, it is impossible for Columbia to know who is suing and about what.  It is also

13   impossible for Columbia to know whether any investor's claim was even assignable, as fraud claims

14   are not assignable in all states.  *See, e.g.*, *Superpumper, Inc. v. Leonard, Tr. for Bankr. Est. of Morabito*,

15   137 Nev. 429, 433 n. 1 (2021) (fraud claims not assignable under Nevada law).

16        For those reasons, Plaintiffs' claims should be dismissed for failure to state a claim.

17   **C.    Plaintiffs' Claim for Aiding and Abetting Fraud Must Be Dismissed**

18        Under Washington law,[5] aiding and abetting liability falls within the rubric of "concerted

19   action."  *Martin v. Abbott Labs.*, 102 Wash. 2d 581, 596 (1984).  This is not a tort but a theory of

20   liability, under which the plaintiff must show 1) primary liability against the principal tortfeasor; 2) the

21   defendant had actual knowledge of the principal tortfeasor's tort (i.e., fraud or a breach of duty); and 3)

22   the defendant gave substantial assistance or encouragement to the principal tortfeasor in the

23   commission of the tort.  *Meridian Funds.*, 485 B.R. at 615–16; *see also Abbott Labs.*, 102 Wash. 2d at

24   596 (noting that Washington has adopted the Restatement (Second) formulation for aiding and abetting

25

26   [4] As previously explained, Plaintiffs allege that iCap was comprised of 31 different entities, Compl. ¶ 1 n.1, but that investors directly invested into only six of those entities, *id.* ¶ 45.

27

28   [5] Although not stated in the Complaint, Columbia assumes for purposes of this Motion that Plaintiffs are attempting to bring their claims under Washington law.

liability); *Brashkis v. Hyperion Cap. Grp., LLC*, No. 3:11-cv-05635 RBL, 2011 WL 6130787, at *3 (W.D. Wash. Dec. 8, 2011).  It requires "a tacit agreement among defendants to perform a tortious act." *Westview Invs., Ltd. v. U.S. Bank*, 133 Wash. App. 835, 853 (2006).

Plaintiffs have not adequately alleged iCap's primary liability for fraud, Columbia's actual knowledge of the Ponzi scheme, or Columbia's substantial assistance to the scheme.  Therefore, their claim for aiding and abetting fraud must be dismissed.

### i.    Plaintiffs Fail to Allege iCap's Primary Liability for Fraud With Particularity

To establish aiding and abetting fraud, Plaintiffs must first demonstrate iCap's fraud.  *See Brashkis*, 2011 WL 6130787, at *3.  And Plaintiffs must plead both iCap's fraud and Columbia's aiding and abetting with particularity under Rule 9(b).  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003) (where a plaintiff "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim, . . . the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)").

In Washington, a fraud claim has nine elements:

"(1) representation of an existing fact; (2) materiality [of the fact]; (3) falsity [of the fact]; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff."

*Adams v. King Cnty.*, 164 Wash. 2d 640, 662 (2008) (quoting *Stiley v. Block*, 130 Wash. 2d 486, 505 (1996)).  Rather than identify the specific misrepresentations that iCap allegedly made as Rule 9(b) requires, Plaintiffs simply declare iCap to have been a "Ponzi scheme," as if saying those magic words somehow renders Rule 9(b) inapplicable.

But a "Ponzi scheme" is not a tort.  Rather, as Ninth Circuit case law describes, it simply refers to a specific *type* of fraud.  In a Ponzi scheme, the fraud is not how funds are utilized, but rather the

misrepresentations about the profitability and viability of the underlying business venture.  Thus, the Ninth Circuit defines a Ponzi scheme as:

> "an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected. <u>The fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit making business opportunity exists, where in fact no such opportunity exists.</u>"

*In re Agric. Research & Tech. Grp., Inc.*, 916 F.2d 528, 531 (9th Cir. 1990) (citing *Cunningham v. Brown*, 265 U.S. 1 (1924)) (emphasis added).

There is nothing fraudulent about running an unprofitable business or soliciting new investors to pay off existing investor obligations.  It is not uncommon for businesses to report losses or acquire new capital to pay off maturing debentures, and iCap doing so does not make it a fraud.  *In re EPD Inv. Co., LLC*, 114 F.4th 1148, 1169 (9th Cir. 2024) (Clifton, J. dissenting) (noting that "Amazon and Tesla each famously failed to turn a profit for more than a decade before becoming among the most valuable corporations in the world");[6] *accord Quadrant Structured Prods. Co. v. Vertin*, 115 A.3d 535, 547 (Del. Ch. 2015) ("Directors cannot be held liable for continuing to operate an insolvent entity in the good faith belief that they may achieve profitability, even if their decisions ultimately lead to greater losses for creditors.") (discussing *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007)).  Rather, what would make it a fraudulent "Ponzi scheme" would be *misrepresentations* to investors that the business venture was profitable (when it was not) and the use of new investor money to portray the business as profitable.

On those critical points, Plaintiffs' pleading is vague and contradictory.  Those misrepresentations generally fall into three categories: promises in the "majority" of private placement memoranda (PPMs) of returns between 9 and 12%; promises in some notes and debentures for specific interest rates payable immediately after the closing of the applicable loan; and representations to

---

[6] Amazon also reported a $2.7 billion net operating loss in 2022.  *See* Jim Milliot, "Online Sales Stall at Amazon, More Layoffs Coming," *Publisher's Weekly* (Feb. 3, 2022), *available at* https://www.publishersweekly.com/pw/by-topic/industry-news/financial-reporting/article/91458-online-sales-stall-at-amazon-more-layoffs-coming.html (last accessed December 17, 2025).

Case No. 2:25-cv-01870

1   investors about the health of certain funds that occurred in calls, letters, and quarterly reports between

2   May 2016 and November 2018.  Compl. ¶¶ 8, 23, 42, 70–75, 79, 80, 82.  But for each of these alleged

3   misrepresentations, Plaintiffs have not alleged which funds the alleged misrepresentations pertained to

4   (or whether they were universal), when the misrepresentations were made, which investors were

5   promised which rates for which funds, and whether any assigning investor "heard" the

6   misrepresentations.  These allegations do not meet the requirement that Plaintiffs identify "the time,

7   place, and specific content of the false representations as well as the identities of the parties to the

8   misrepresentations."  *Fuhlendorf*, 2010 WL 11500146, at *4.

9       And many of these alleged misrepresentations are contradictory.  The Complaint alleges that the

10  fraud began both in 2013 and 2018.  *Compare* Compl. ¶¶ 8, 102–04, 106 *with id.* ¶¶ 56, 67, 98–99.  It

11  references how investors were told their funds would be used for a "reserve" account to pay interest

12  obligations, *id.* ¶ 75, but also told investors on a call that interest payments were not serviced from

13  investor funds, *id.* ¶ 77.  It also alleges that certain of iCap's funds paid the promised returns, and until

14  at least December 2020, iCap's real estate investments generated a net gain.  *Id.* ¶¶ 52, 95 (alleging the

15  business was profitable between September 2013 and December 2020).  That is not "fraud" or a "Ponzi

16  scheme" as alleged and, even if it was, Plaintiffs contradict themselves on when it began.

17      **ii.**    **Plaintiffs Fail to Allege Columbia's Actual Knowledge of the Alleged Ponzi**
18          **Scheme**

19          **a.**    **Plaintiffs Fail to Plead the Necessary Elements to Show Actual**
              **Knowledge of a Ponzi Scheme**

20      Plaintiffs allege that Columbia "learned the iCap enterprise was a Ponzi scheme through its

21  unique view into iCap's financial activities."  Compl. ¶ 132.  However, the allegations in the complaint

22  fail to show that Columbia had actual knowledge of any alleged Ponzi scheme.

23      First, as explained, a "Ponzi scheme" is a specific type of fraud in which the misrepresentations

24  are about the viability and profitability of the enterprise.  *In re Agric. Research*, 916 F.2d at 531.

25  Therefore, to sufficiently allege that Columbia aided and abetted iCap's Ponzi scheme, Plaintiffs must

26  allege that Columbia had actual knowledge that iCap: 1) was not a legitimate profit-making

27  opportunity; 2) had falsely represented to investors it was paying them from profits; and 3) was using

28

new money to misrepresent iCap's financial viability. There is no attempt to make these required allegations. Plaintiffs instead misdirect by alleging that Columbia knew that iCap received money from investors, Compl. ¶¶ 126–30; transferred money among its various accounts, sometimes to cover an account with insufficient funds, *e.g. id.* ¶¶ 135–36; and that in 2018 its tax returns showed losses "in the millions" that called into question its ability to pay Christensen a salary, *id.* ¶¶ 141–42. Those assertions do not come even close to plausibly alleging Columbia had actual knowledge that iCap was a Ponzi scheme. *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) ("When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation").

Critically absent here are allegations that Columbia knew what iCap promised its investors. Plaintiffs do not allege that Columbia viewed, or even had access to, the PPMs, promissory notes, debentures, and other investor-directed communications in which iCap allegedly promised various terms to investors. *See, e.g.,* Compl. ¶¶ 23, 70, 71, 72, 74, 75, 79, 82, 89, 90 (allegations of iCap's promises to investors). Plaintiffs allege only that Columbia had operating agreements, quarterly financial statements, and tax returns for some of iCap's entities. *Id.* ¶ 127. For several reasons, those allegations do not support Plaintiffs' claims. First, the only operating agreement that Columbia allegedly had was for Fund 5. *Id.* But Plaintiffs do not allege that any investors directly invested into Fund 5. And even if Columbia had *all* of iCap's operating agreements, Plaintiffs fail to identify with any specificity what information was contained within those documents that would have led Columbia to understand that iCap was a Ponzi scheme. Without more, Plaintiffs fail to allege with any particularity what precisely Columbia knew about the promises that iCap had made to its investors.

Second, there are no allegations Columbia knew that iCap was paying investors from other investors' proceeds. With the benefit of hindsight and access to iCap's internal accounting records as Trustees of the company, Plaintiffs have calculated the percentage of iCap's deposits that they believe came from investors, intercompany transfers, and legitimate business operations. *E.g. id.* ¶ 46 ("Approximately 95% of the cash deposited with the Investment Entities into their bank accounts at Umpqua was sourced either from Investors or from other iCap Entities."). However, Plaintiffs have

1  made no allegations Columbia knew the composition of iCap's deposits. Plaintiffs assume only that,

2  because Columbia "had direct visibility into the deposits[, they] could tell" that the deposits were thusly

3  comprised. *Id.* ¶ 137. That assertion is not a factual allegation, it is rank speculation, and more

4  importantly, it does not even allege actual knowledge of a Ponzi scheme.

5  And as for Columbia's knowledge of iCap's reported tax losses for 2018, such a loss does not

6  indicate that the business is not a legitimate profit-making opportunity.  It simply means that, for that

7  tax year, the business's expenses exceeded its income.  Without knowing the particulars of iCap's

8  promises to its investors and whether it disclosed these losses, *see id.* ¶ 71, Columbia could not have

9  known whether iCap's reported tax losses were incompatible with those promises.  Knowledge of a

10  reported tax loss is not the same as knowledge of a business committing fraud.

11  **b.    Plaintiffs' Theory of Actual Knowledge Lacks Factual Support**

12  Lastly, Plaintiffs' allegations of actual knowledge in Count 1 are not supported by sufficiently

13  particularized facts in the Complaint.  In support of their claim for aiding and abetting fraud, Plaintiffs

14  allege that Columbia knew certain pieces of information about iCap that amount to actual knowledge of

15  iCap's Ponzi scheme.  Compl. ¶ 174.  However, the facts alleged in their Complaint do not support

16  these allegations.  Plaintiffs allege:

17  1.    **iCap's accounts at Umpqua held investor money "and that Investors believed they**

18  **were investing in a legitimate real estate investment business."** *Id.* ¶ 174(a).  This misstates who

19  had ownership of iCap's accounts under Washington law.  *See* p. 14, *infra.*  Further, Plaintiffs have not

20  alleged any facts that would support an inference that Columbia knew what investors believed.

21  2.    **iCap's accounts "were regularly at a deficit balance and were frequently**

22  **overdrawn" and that iCap was moving money around its accounts "to cover the deficits,**

23  **overdrafts, and obligations to existing Investors," actions that amounted to "commingling**

24  **investor funds."** Compl. ¶ 174(b), (g).  Plaintiffs have not alleged facts to support their allegation that

25  iCap's accounts were regularly overdrawn or at a deficit balance.  Rather, Plaintiffs have alleged only

26  three instances over the span of nine years in which an iCap account had insufficient funds to cover a

27  pending payment.  *Id.* ¶¶ 2, 136, 145, 154, 155 (insufficient funds in particular accounts in January

28  2014, February 2022, and April 2022).  The Complaint does not allege that Columbia knew these three

occurrences involved payments to or from investors.

Furthermore, commingling is a fiduciary concept that arises when there is a duty to keep funds or assets separate, and that duty is breached. *See Commingling*, Black's Law Dictionary (12th ed. 2024). To know whether transfers among iCap's accounts were improper, Columbia would have to know whether iCap had a duty to keep segregate funds. Plaintiffs have not alleged that Columbia had any such knowledge, and Columbia was not required to make such inquiry under Washington law. RCW §§ 30A.22.090, 30A.22.120.

Additionally, the use of the term "investor funds" is incorrect. Once money is deposited into iCap's accounts, the money belongs to iCap. *See* RCW § 30A.20.090 (permitting banks to "disregard[] without liability" any adverse claims to a depositor's funds unless the adverse claimant procures a "restraining order, injunction, or other appropriate process"), § 30A.22.220. Plaintiffs' assertion that iCap's accounts contained "investor funds" fundamentally misunderstands banking laws. From Columbia's perspective, and as provided by statute, the money in iCap's accounts belonged to iCap and only to iCap. *See Sherlock Invs.-Duvall LLC v. Intercoastal Auto Brokers & Logistics, LLC*, No. 2:20-cv-00129-RAJ-BAT, 2020 WL 4729066, at *6 (W.D. Wash. Apr. 7, 2020) (applying RCW §§ 30A.20.090 and 30A.22.220 to bank).

3.     **The "vast majority" of deposits and withdrawals went to and from investors and intercompany transfers, despite representations to the contrary to investors.** Compl. ¶ 174(c), (d). Plaintiffs' allegations related to Columbia's knowledge rely exclusively on the Bank's "visibility into the deposits." *Id.* ¶ 137. Plaintiffs have not alleged that Columbia knew what iCap had represented to investors related to the funding of investments, nor have they alleged facts that would support such an inference. Plaintiffs have also not alleged that Columbia knew that the majority of iCap's withdrawals were paid out as returns to investors or as intercompany transfers.

4.     **"iCap's banking activities were 'out of pattern for an investment firm.'"** *Id.* ¶ 174(e). As described in the Complaint, the transactions causing concern were cash deposits for

1    $400,000.  Plaintiffs do not explain how cash deposits into iCap's accounts would have told Columbia

2    employees that iCap was perpetrating a Ponzi scheme.[7]

3        5.    **iCap's reported tax losses.**  *Id.* ¶ 174(f).  Columbia's knowledge of iCap's tax losses is

4    not enough to establish that Columbia knew iCap was a Ponzi scheme.  It is not uncommon for

5    businesses to report losses, and iCap doing so "is not enough to establish that it was doomed to failure."

6    *In re EPD Inv. Co., LLC*, 114 F.4th at 1169.  (Clifton, J., dissenting).

7        6.    **Chris Christensen transferred "Investor funds" into personal accounts, including**

8    **to buy a vacation home.**  Compl. ¶ 174(h), (i).  Plaintiffs have alleged no facts that would support an

9    inference that Columbia had actual knowledge that transfers to Chris Christensen's personal accounts

10   were not legitimate.  Washington statute immunizes banks for honoring transactions by duly authorized

11   depositors in all but a few narrow circumstances not present.  RCW § 30A.22.120.  Unless the bank has

12   "actual knowledge" of a dispute between "depositors, beneficiaries, or other persons claiming an

13   interest in the funds," the bank is immunized from liability for honoring "all payments" on the account.

14   *Id.*; *see also Matter of Est. of Ridley*, 195 Wash. App. 1001, at *6 (2016) (unpublished) (affirming grant

15   of summary judgment to bank on Trust and Estates Dispute Resolution Act claim because there was no

16   evidence that bank had actual knowledge of an adverse claim to funds under RCW § 30A.22.120).

17   Further, the bank is not required to inquire into the "source or the ownership of any funds."  *Id.*  Here,

18   Columbia was entitled under RCW § 30A.22.120 to presume that any transfers to Chris Christensen's

19   personal accounts were for legitimate purposes.  Because of the immunity granted to Columbia by

20   RCW § 30A.22.120, the transfers cannot themselves be used as circumstantial evidence that Columbia

21   had actual knowledge that the transfers were illegitimate.  And Plaintiffs allege no facts other than the

22   transfers themselves to assert that Columbia knew that they were not made for a legitimate purpose.

23   That logic is circular, and does not satisfy Rule 8 or Rule 9(b).

24

25

26   [7] Cash transactions alert banks to the risk that a bank customer could be laundering money through the
     bank.  *See* FFIEC BSA/AML Manual, "Risks Associated with Money Laundering and Terrorist
27   Financing," *available at*
     https://bsaaml.ffiec.gov/manual/RisksAssociatedWithMoneyLaunderingAndTerroristFinancing/26 (last
28   accessed December 14, 2025).

1    Furthermore, Plaintiffs allege that Chris Christensen purchased a vacation home with money

2    that he converted from iCap, Compl. ¶¶ 104, 147, but have alleged no facts that would support an

3    inference that Columbia knew that the purchase was related to a personal vacation home for

4    Christensen.  Particularly given that iCap was a real estate investment company, the transactions from

5    iCap accounts to Oceanaire and First American Title Company could have appeared to anyone at

6    Columbia who reviewed the transactions as legitimate business-related transactions.

7    Plaintiffs' allegations, taken together, do not state a claim that Columbia "reach[ed] a conscious

8    decision to participate in [iCap's] tortious activity."  *Meridian Funds*, 485 B.R. at 617 (citing *Neilson v.*

9    *Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1119 (C.D. Cal. 2003)).

10
11
###    iii.    Plaintiffs Fail to Allege Columbia's Substantial Assistance to the Alleged Ponzi Scheme

12    Washington has adopted the Second Restatement of Torts approach to aiding and abetting

13    liability.  *Abbott Labs.*, 102 Wash. 2d at 596.  Under this approach, substantial assistance exists "where:

14    (1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so

15    enables the fraud to proceed; and (2) the actions of the aider/abettor proximately caused the harm on

16    which the primary liability is predicated."  *Meridian Funds*, 485 B.R. at 617 (quoting *In re Agape*

17    *Litigation*, 681 F. Supp. 2d 352, 364 (E.D.N.Y. 2010)) (internal quotation marks omitted).  "[A] bank's

18    performance of routine banking transactions does not constitute substantial assistance in another's

19    tort."  *Huang v. Hong Kong & Shanghai Banking Corp. LTD*, No. 1:20-cv-03548-LTS-SN, 2022 WL

20    4123879, at *5 (S.D.N.Y. 2022) (citing *In re Agape Litig.*, 681 F. Supp. 2d at 365).  "Ordinary business

21    transactions that a bank performs for its customer can satisfy the substantial assistance element of an

22    aiding-and-abetting claim only if the bank 'actually knew that those transactions were assisting the

23    customer in committing a specific tort.'"  *El Camino Res., LTD. v. Huntington Nat. Bank*, 722 F. Supp.

24    2d 875, 910–11 (W.D. Mich. 2010), *aff'd*, 712 F.3d 917 (6th Cir. 2013) (quoting *Casey v. U.S. Bank*

25    *Nat. Assn.*, 127 Cal. App. 4th 1138, 1145 (2005)).

26    Each of the specific ways that Plaintiffs allege Columbia assisted iCap's Ponzi scheme are either

27    not pled with particularity to satisfy Rule 9(b), or do not rise to the level of substantial assistance

28    because they are routine banking transactions:

1.    **Failing to end its relationship with iCap "when it learned of the fraud."**  Compl.
¶ 176(a).  Nowhere in their Complaint do Plaintiffs allege when Columbia "learned of the fraud," so it
is not clear when exactly Plaintiffs believe that Columbia should have "shut[] down iCap's banking
relationship."  This allegation amounts to an allegation that Columbia continued to provide routine
banking services to iCap, which is not enough to amount to substantial assistance.  *Huang*, 2022 WL
4123879, at *5.  Additionally, this allegation relies on a failure to act rather than an affirmative action,
which requires Plaintiffs to show that Columbia either owed a duty to the investors or remained
inactive in an effort to mislead and facilitate iCap's Ponzi scheme.  Restatement (Third) of Torts:
Economic Harms § 28, *cmt. d*.  Plaintiffs have alleged neither.

2.    **"Helping" the Christensens move money among accounts, including when
overdrafts occurred.**  Compl. ¶ 176(b).  As discussed above in Section IV.C.ii.b, the Complaint only
cites three instances when an iCap account had insufficient funds to cover a pending payment.  *Id.* ¶¶ 2,
136, 145, 154, 155.  And as a general matter, allowing a bank customer to have frequent overdrafts is
not enough to allege the substantial assistance of aiding and abetting.  *Pereira v. United Jersey Bank,
N.A.*, 201 B.R. 644, 665–66, 671–72 (S.D.N.Y. 1996) (allegations that bank extended generous
overdraft, among other actions, were insufficient to establish substantial assistance).

3.    **Processing transfer requests from the Christensens for "personal use."**  Compl.
¶ 176(c).  As discussed above, *supra* Section IV.C.ii.b, Plaintiffs do not make allegations that would
support an inference that Columbia knew that the transfers to the Christensens' personal accounts were
for an illegitimate purpose, and Washington law permitted Columbia to presume they were legitimate,
RCW § 30A.22.120.  Given that, the transfers that Plaintiffs allege were no more than routine banking
services that do not amount to substantial assistance of iCap's Ponzi scheme.

4.    **"Working to add a mechanism to iCap's online banking platform" to connect
business accounts to Chris Christensen's personal banking account.**  Compl. ¶ 176(d).  Plaintiffs'
own allegations contradict this assertion, as the email screenshot in the Complaint includes a response
from Ms. Tzekov stating that she was unable to "add business accounts to the personal online banking
profiles."  *Id.* ¶ 3.  Plaintiffs do not explain how "working" to allow a customer to transfer funds from

a business account to a personal account (something commonly done in banks) constitutes substantial assistance.

5.    **"Failing to communicate the concerns generated by its investigations to regulatory agencies and law enforcement."**  *Id.* ¶ 176(e).  First, this allegation again identifies a failure to act, which is not substantial assistance absent a duty owed to the investors or allegations that Columbia remained inactive specifically to further the Ponzi scheme.  *See* Restatement (Third) of Torts: Economic Harms § 28, *cmt. d*.  Second, Plaintiffs assert no basis for alleging that Columbia had a duty to report to law enforcement.  To the extent that this allegation relies on Columbia's obligations pursuant to the Bank Secrecy Act ("BSA"), *see* Compl. ¶¶ 116–22, that cannot be a basis for liability because the BSA does not provide a private right of action.  *See El Camino Res.,* 722 F. Supp. 2d at 923.  Third, if Columbia *had* reported iCap's suspicious activity to law enforcement, Columbia would be under a non-waivable obligation to keep that information confidential and would not be able to disclose it to Plaintiffs.  12 C.F.R. § 21.11(k) ("A [suspicious activity report ("SAR")], and any information that would reveal the existence of a SAR, are confidential, and shall not be disclosed except as authorized in this paragraph (k)."); 12 C.F.R. § 353.3(g) (same, as applied to state-chartered banks).

6.    **Filling out forms incorrectly.**  Compl. ¶ 176(f).  This allegation is not supported by the facts as alleged in Plaintiffs' Complaint, because the single form in question, as described by Plaintiffs, asked whether iCap was a "Higher Risk Line of Business as defined in UBGC 210.3.2" and "had not had three or more overdrafts."  *Id.* ¶ 167.  Plaintiffs acknowledge that they do not know what that reference is, nor whether iCap had more than three overdrafts, and so they do not know whether this form was filled out incorrectly.  *Id.* ¶ 167.

D.    **Plaintiffs' Claim for Aiding and Abetting Breach of Fiduciary Duty Must Be Dismissed**

i.    **Plaintiffs Fail to Adequately Allege iCap's Primary Liability for Breach of Fiduciary Duty**

As discussed above, aiding and abetting liability depends on the establishment of primary liability against another party for the primary tort.  Alleging breach of fiduciary duty requires the plaintiff to show "(1) existence of a duty owed, (2) breach of that duty, (3) resulting injury, and (4) that

1    the claimed breach proximately caused the injury." *Micro Enhancement Int'l, Inc. v. Coopers &*

2    *Lybrand, LLP*, 110 Wash. App. 412, 433–34 (2002) (citing *Miller v. U.S. Bank of Wash.*, 72 Wash.

3    App. 416, 426 (1994)).  "Generally, participants in a business transaction deal at arm's length."

4    *Liebergesell v. Evans*, 93 Wash. 2d 881, 889 (1980).  And crucially, placing trust and confidence in

5    another is not sufficient to create a fiduciary relationship.  *Perkumpulan Inv. Crisis Ctr. Dressel-WBG*

6    *v. Regal Fin. Bancorp, Inc.*, 781 F. Supp. 2d 1098, 1114 (W.D. Wash. 2011) (citing *Moon v. Phipps*, 67

7    Wash.2d 948, 954 (1966)).

8                            a.    **Plaintiffs Fail to Allege the Existence of a Fiduciary Duty**

9            Under Washington law, fiduciary relationships exists only if a) the type of relationship has

10   traditionally been considered fiduciary or b) "special circumstances exist in which one party justifiably

11   relies on another to look after the former's financial interests."  *Meridian Funds*, 485 B.R. at 618.

12   "[T]he general rule remains that an investment adviser owes a fiduciary duty only to the fund it

13   manages."[8]  *Id.* at 619–20 (typically an "adviser is concerned with the fund's performance rather than

14   the individual financial circumstances of each of the fund's investors" (citations omitted)).  In *Meridian*

15   *Funds*, the Court held that the Complaint failed because there were no allegations the investment

16   adviser "was 'advising' these investors in any way as to how they should invest their funds based upon

17   their individual financial circumstances" or had a "direct relationship" with any investors.  *Id.* at 620,

18   622.[9]

19           The Complaint does not establish the existence of a fiduciary relationship between the

20   Christensens and investors.  The Complaint describes an arms-length relationship in which the

21   Christensens solicited investors (at least some of whom had their own investment advisers, Compl.

22   ¶ 33), not an advisory relationship.  *See, e.g.*, *id.* ¶ 29 (describing the Christensens as "solicit[ing] the

23   Investors"); *id.* ¶ 180 (alleging the Christensens breached their fiduciary duties to investors, in part, by

24

25   [8] And here, the funds' claims are barred by the doctrine of *in pari delicto* because Plaintiffs allege the
     funds defrauded investors. *See* n.3, *supra*.

26

27   [9] The Court also found that the plaintiffs did not allege a fiduciary relationship based on the existence
     of any trust accounts.  *Meridian Funds*, 485 B.R. at 622.  There are no allegations in the Complaint that
28   the iCap accounts were trust accounts, which is also why they did not contain "investor funds."

"*selling* the Investors promissory notes and fund offerings, and *soliciting* and *accepting* investments" via misrepresentations)" (emphasis added)).  Nowhere does the Complaint detail an individual relationship in which the Christensens "advis[ed]" investors "as to how they should invest their funds based upon their individual financial circumstances."  *Meridian Funds*, 485 B.R. at 620.  Rather, the Complaint cites promotional materials and investor calls, not individual communications with investors.  Compl. ¶¶ 28–35.

And although the Complaint purports to allege that the Christensens established their fiduciary relationship by communicating with investors from 2014–2022, the Complaint only cites five investor calls between November 2020 until March 2023 that addressed Funds 1, 2, 3, and Vault, as well as general "investor calls."  *Id.* ¶ 33.  It is entirely unclear from the Complaint 1) which investors were on these calls; 2) if any of those investors contributed their claims to the Trust; and 3) which investors had investment advisers making decisions for them.  And given that Columbia has no understanding of the investors' identities, claims, or damages, it is possible not a single investor who assigned their claims to the Trust heard any of these calls. Plaintiffs fail to allege a fiduciary duty existed between the Christensens and investors.

### b.    Plaintiffs Fail to Allege Breach With Particularity

Even if the Complaint did allege a fiduciary duty existed between the Christensens and some investors, the Complaint fails to allege breach with particularity.  Plaintiffs allege that the Christensens breached their fiduciary duties "[t]hrough their lies to Investors, perpetration of the iCap Entities' Ponzi scheme, and other fraudulent conduct."  Compl. ¶ 27.  Rule 9(b) therefore applies to Plaintiffs' breach of fiduciary duty, because it sounds in fraud.  *See Vess*, 317 F.3d at 1103.

For the reasons stated above in Section IV.C.i, Plaintiffs have failed to allege the "who, what, when, where, and how" of the alleged iCap Ponzi scheme or "other fraudulent conduct."  *See Cafasso*, 637 F.3d at 1055. To the extent that "lies to Investors" are a separate alleged breach not addressed in briefing on the alleged Ponzi scheme, the Complaint cites six investor calls, letters, PPMs, and reports from 2016 and 2018 about Funds 1, 2, and 4 to allege that lies to investors occurred.  *See* Compl. ¶¶ 42, 77, 87–93.  These documents and calls only address Funds 1, 2, and 4, but not the other three investment vehicles investors directly invested into.  *Id.* ¶¶ 33, 45.  And these allegations only address

representations made in 2016 and 2018, and it is furthermore unclear who received these letters or were on these calls.  Without more information, Plaintiffs have failed to plead breach of fiduciary duty with particularity.

ii.     **Plaintiffs Fail to Allege Columbia's Secondary Liability for Breach of Fiduciary Duty**

a.      **Plaintiffs Fail to Allege Actual Knowledge of Any Fiduciary Duty**

As discussed above, "under Washington law, to plead a claim for aiding and abetting a plaintiff must allege (i) the existence of a violation by the primary wrongdoer; (ii) knowledge of this violation by the aider and abettor; and (iii) that the aider and abettor substantially assisted in the primary wrong." *Meridian Funds*, 485 B.R. at 616.  To properly allege that Columbia aided and abetted a breach of fiduciary duty, the Complaint first must allege that Columbia actually knew "of the existence of a direct relationship between" the Christensens and the investors.  *See id.* at 622.

Plaintiffs fail to allege that Columbia knew of any such duty.  Plaintiffs summarily allege that Columbia "knew the nature of iCap's business" and that the Christensens owed investors a fiduciary duty.  Compl. ¶¶ 171, 181.  Plaintiffs also allege that Columbia knew iCap afforded "complete discretion" to Christensen and his managers, and that "Investors had, therefore, placed a substantial amount of trust" in iCap and the Christensens.  *Id.* ¶ 181.  But knowing the nature of an investment business and that principals "solicited and accepted investments," is not enough to know of a "direct relationship" between the Christensens and investors that might create a fiduciary duty.  *See Meridian Funds,* 485 B.R. at 620.  These allegations go to Columbia's alleged understanding of iCap, not to any understanding of the relationship between iCap and the investors.  And, an allegation that investors had "trust" in iCap and the Christensens is clearly not sufficient.  *See id.*

Furthermore, allegations that Columbia "reviewed the relevant Fund documents," Compl. ¶ 181, do not support actual knowledge of any fiduciary duties.  Although the Complaint relies heavily on representations made in PPMs and calls with investors, there is no allegation Columbia ever saw such PPMs or attended any investor calls.  Rather, the only related allegation was that Columbia saw financial documents such as operating agreements and tax returns.  *See id.* ¶ 127.  There are no allegations that Columbia knew of any representations made to investors at all, much less

1    representations that would establish a direct, advisory relationship that could create a fiduciary duty.

2    For these reasons, the Complaint fails to allege that Columbia had actual knowledge of any fiduciary

3    duty.

4                    **b.    Plaintiffs Fail to Allege Columbia's Actual Knowledge of or**
                        **Substantial Assistance to Any Breach of Fiduciary Duty**
5

6           Plaintiffs also fail to allege Columbia's actual knowledge of or substantial assistance to any

7    breach of fiduciary duty.  "Actual knowledge necessarily requires a defendant to reach a conscious

8    decision to participate in tortious activity for the purpose of assisting another in performing a wrongful

9    act."  *Meridian Funds*, 485 B.R. at 617. Substantial assistance exists where a defendant's actions allow

10   the fraud to proceed and those actions "proximately caused the harm on which the primary liability is

11   predicated."  *Id.* (quoting *In re Agape Litig.,* 681 F. Supp. 2d at 364).

12          The Complaint alleges that "[t]hrough their lies to Investors, perpetration of the iCap Entities'

13   Ponzi scheme, and other fraudulent conduct, the Christensens breached their fiduciary duties to

14   Investors."  Compl. ¶ 27.  As to the alleged Ponzi scheme and other fraudulent conduct, the Complaint

15   relies on identical allegations in the fiduciary duty allegations as for why Columbia supposedly had

16   actual knowledge of and substantially assisted iCap's Ponzi scheme (as discussed above in Section

17   IV.C.ii–iii).  *Compare* Compl. ¶ 174 (detailing nine reasons why Columbia allegedly actually knew

18   about iCap's Ponzi scheme) *with id.* ¶ 184 (same); *compare id.* ¶ 176 (stating six ways Columbia

19   allegedly substantially assisted iCap's Ponzi scheme) *with id.* ¶ 186 (same).  And, for the same reasons

20   stated above, the Complaint has failed to sufficiently allege that Columbia had actual knowledge or

21   substantially assisted in aiding and abetting iCap's alleged Ponzi scheme.

22          To the extent that "lies to Investors" are a separate alleged breach not addressed in briefing on

23   the alleged Ponzi scheme, the Complaint also fails to allege any actual knowledge of or substantial

24   assistance to any such breach.  As discussed above, the Complaint cites six investor calls, letters, PPMs,

25   and reports from 2016 and 2018 to allege that lies to investors occurred.  *See id.* ¶ 42.  But the

26   Complaint never alleges that Columbia ever saw any of iCap's PPMs, letters to investors, or quarterly

27   reports, or heard any of the investor calls.  *Cf. id.* ¶ 127 ("Umpqua sought and received related

28   documents such as operating agreements" and "quarterly financial statements and tax returns").  There

are no allegations that Columbia knew of any representations made to investors at all, including any alleged lies. *Cf. Cotton v. Wells Fargo Bank N.A.*, No. SACV 10-01758-CJC(RNBx), 2011 WL 13227816, at *3 (C.D. Cal. Feb. 22, 2011) (even where bank knew that a PPM "stated that the investors' funds would be used in guaranteed transactions" and that the bank knew the relevant "wire transfer was not a guaranteed transaction," the allegations did not allege actual knowledge.  And there are no allegations addressing about how, if at all, Columbia substantially assisted iCap and the Christensens in their alleged lies to investors.

For these reasons, Plaintiffs' aiding and abetting breach of fiduciary duty claim should be dismissed.

# V.    CONCLUSION

For these reasons, Columbia requests that the Court dismiss Plaintiffs' Complaint with prejudice.

## LCR 7(e)(6) CERTIFICATION[21]

I certify that this memorandum contains 8,394 words, in compliance with the Local Civil Rules.

Dated: December 30, 2025                 Respectfully Submitted,

FOSTER GARVEY PC

By  *s/ Jason M. Ayres*
Jason M. Ayres, WSBA #39141
Email: Jason.Ayres@foster.com
Tara J. Schleicher, WSBA #26884
Email: Tara.Schleicher@foster.com

1111 Third Avenue, Suite 3000
Seattle, WA  98101
Telephone: (503) 228-3939

STOLL STOLL BERNE LOKTING &
SHLACHTER, P.C.

By: *s/ Lydia Anderson-Dana*
Keith Ketterling (*pro hac vice*)
kketterling@stollberne.com
Lydia Anderson-Dana (*pro hac vice*)
landersondana@stollberne.com
Madeleine Holmes (*pro hac vice*)
mholmes@stollberne.com
Erin E. Roycroft (*pro hac vice*)
eroycroft@stollberne.com
Anuj Shah (*pro hac vice*)
ashah@stollberne.com

209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

*Attorneys for Columbia Bank*
*f/k/a Umpqua Bank*

Case No. 2:25-cv-01870