UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LANCE MILLER, et al.,

                    Plaintiffs,

         v.

COLUMBIA BANK f/k/a UMPQUA
BANK,

                    Defendant.

CASE NO. C25-1870JLR

ORDER

## I.   INTRODUCTION

Before the court is Defendant Columbia Bank's ("Columbia"[1]) motion to dismiss. (MTD (Dkt. # 23); Reply (Dkt. # 27); *see also* Compl.)  Plaintiffs Lance Miller and Seth Freeman oppose the motion.  (Resp. (Dkt. # 26).)  Plaintiffs serve as co-Trustees of the iCap Trust (the "Trust").  (Compl. ¶¶ 15-16.)  The Trust was created pursuant to the

---

[1] Plaintiffs' complaint refers to Columbia by its former name, "Umpqua Bank."  (*See generally* Compl. (Dkt. # 1).)  The court refers to Columbia by its current name in this order.

ORDER - 1

Chapter 11 liquidation plan and Trust Agreement of non-party iCap Enterprises, Inc.—a collection of nearly 30 purported real estate investment businesses used to conduct the fraud at issue in this action, collectively referenced herein as "iCap" or the "iCap Entities." (*Id.* ¶ 1 n.1 (listing the related enterprises).) The court has considered the parties' submissions, the relevant portions of the record, and the governing law. Being fully advised,[2] the court DENIES Columbia's motion.

## II.    BACKGROUND[3]

Plaintiffs bring this action on behalf of investors who assigned their claims against third parties to the Trust. (*Id*. at 1.) They allege that Columbia knowingly assisted iCap, Chris Christensen, and Jim Christensen (together the "Christensens") in the commission of fraud and breaches of fiduciary duties. (*Id.* ¶ 9.) According to Plaintiffs, during a 10-year period beginning in 2013, the Christensens "stole or otherwise squandered approximately $230 million obtained from over 1,800 investors in the United States and abroad[.]" (*Id.* ¶ 8; *see also id*. ¶ 22.) Plaintiffs allege that the Christensens used the investors' funds to make payments to pre-existing iCap investors and that iCap provided little or no return on these investments (the "iCap Ponzi Scheme").[4] (*Id*.) Plaintiffs

---

[2] Columbia requests oral argument and Plaintiffs do not. (MTD at 1; Resp. at 1.) The court concludes that oral argument would not assist it in deciding the motion. (*See* Local Rules W.D. Wash. LCR 7(b)(4).

[3] The court accepts Plaintiffs' allegations as true when evaluating Columbia's motion to dismiss. *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016) (citation omitted).

[4] Plaintiffs define a Ponzi scheme as a fraudulent business operation whereby "the fraudster lacks sufficient funds, *i.e.*, actual revenues from investments, to meet its obligations to existing investors but is able to perpetuate operations by shuffling funds from new investors or funds earmarked for other purposes to cover obligations to existing investors." (*Id*. ¶ 133.)

ORDER - 2

further allege that the Christensens ran this fraudulent enterprise through iCap's bank accounts at Columbia. (*Id.* ¶ 7.) According to Plaintiffs, Columbia is liable for losses proximately caused by the iCap Ponzi Scheme because that scheme could not have existed without Columbia's help. (*Id.*)

**A.      History of the iCap Entities**

Chris Christensen founded iCap Enterprises, Inc. on August 9, 2007, and founded its direct subsidiary iCap Equity, LLC, on August 15, 2011. (*Id.* ¶ 21.) He served as the entities' Chief Executive Officer, and his brother, Jim Christensen, served as the Chief Operating Officer. (*Id.*) Between 2011 and 2023, the Christensens solicited private investments in supposed real estate opportunities in the Pacific Northwest and represented to investors that iCap was a real estate investment business. (*Id.* ¶ 22.)

iCap employed more than 35 people and had two business lines: the Portfolio Business and the Vault Business. (*Id.* ¶¶ 22-23.) The Portfolio Business purportedly focused on development of multifamily real estate projects, starting with undeveloped land, building permits, or the improvement of existing structures. (*Id.* ¶ 23.) The Christensens funded the Portfolio Business through private placements of debentures and promissory notes which promised interest rates between 6% and 15%. (*Id.*) The Vault Business focused on investing in "standalone real estate investments that had the potential to be or already were cash flow positive." (*Id.* ¶ 24.) The Christensens financed the Vault Business's operations through private placement notes and public demand notes. (*Id.*) Plaintiffs allege that the two business lines provided little to no return on investment and that the Christensens used both new investments and intercompany

ORDER - 3

transfers to pay pre-existing investors, thereby simulating a return.  (*Id.* ¶ 25.)  Furthermore, Plaintiffs allege that the Christensens used the new investments and intercompany transfers as a source of compensation and loans to Chris Christensen, which were never repaid to the business.  (*Id.*)

Plaintiffs allege that the Christensens, by virtue of their controlling positions and representations to the iCap investors, owed the iCap investors fiduciary duties that included, in part, "the duties of loyalty, care, integrity, candor, full disclosure, and to deal honestly and in good faith."  (*Id.* ¶ 36.)  Such fiduciary duties required the Christensens to avoid self-dealing and conflicts of interest, and to provide truthful and timely disclosures of the operation and performance of any investments.  (*Id.* ¶ 37.)

**B.      The Alleged Ponzi Scheme**

On September 28, 2023, the iCap Ponzi Scheme "collapsed" after the Christensens resigned from their positions at iCap.  (*Id.* ¶ 38.)  Prior to that time, the Christensens used investor funds to personally enrich themselves.  (*Id.* ¶ 39.)  Specifically, the Christensens had promised iCap investors that they would receive steady returns in exchange for their investments and that the promised returns would be paid from the yield generated by the investments.  (*Id.* ¶¶ 23, 40-41.)  But this was not the case; rather, the Christensens paid existing iCap investors using the contributions of new investors.  (*Id.* ¶ 41.)  To further their fraudulent conduct, the Christensens made several false representations about the state and performance of iCap investments.  (*See id.* ¶ 42 (listing false statements concerning the status of investments and associated returns).)

ORDER - 4

Plaintiffs also allege that the Christensens breached their fiduciary duties to iCap investors by converting substantial funds in Columbia bank accounts for Chris Christensen's personal benefit. (*Id*. ¶ 100.)  During a ten-year period beginning in 2013, Chris Christensen transferred $30,469,282 from iCap accounts to his personal bank accounts, accounts belonging to companies he owned or controlled, accounts used to fund his personal lifestyle expenses, or to repay his personal debt obligations. (*Id*. ¶ 102; *see also id*. ¶ 103 (listing the amount of funds converted each year between 2013 and 2023).)  The Christensens falsely documented these improper transfers of investors' funds as loans, reimbursements, or distributions. (*Id*. ¶ 105.)  Plaintiffs allege that Chris Christensen did not repay the purported loans and that none of the funds categorized as reimbursements or distributions were actually for those purposes. (*Id*.)

**C.    Columbia's Role in the Alleged Ponzi Scheme**

iCap's banking relationship with Columbia began in 2013 and continued for the entirety of the Christensens' operation of that business as a Ponzi scheme. (*Id*. ¶ 106.)  iCap was the most important client of Columbia's Issaquah branch office and Columbia employees described iCap as the branch's "largest deposit customer[.]" (*Id*.)  Svetla Tzekov, Vice President and Branch Manager of the Issaquah branch office and later Community Manager, served as the principal contact to the Christensens for Columbia during the operation of the iCap Ponzi Scheme. (*Id*. ¶¶ 2, 107.)  She serviced and monitored all corporate and personal accounts for the Christensens and iCap. (*Id*. ¶ 107.)  Ms. Tzekov considered the relationship between Columbia and iCap to be strategically important, calling it a "very profitable and big relationship" that, for nearly 10 years,

consistently paid Columbia a treasury management fee of $2,000 to $4,000 per month. (*Id.* ¶ 108.)  Columbia sought to retain iCap and the Christensens' business, even offering to reduce banking fees so as not to lose their business to a competing bank.  (*See id.* ¶¶ 111-115.)

Pursuant to the Bank Secrecy Act ("BSA") and the governing Anti-Money Laundering ("AML") requirements, Columbia implemented internal controls designed to detect if a banking customer was operating a Ponzi scheme, "including a customer identification program; customer due diligence processes; account opening and monitoring procedures; ongoing training for employees; and an automated account monitoring system."  (*Id.* ¶ 120.)  This compliance system flagged transactions or abnormal patterns indicative of potentially illegal activity.  (*Id.*)

Know Your Customer ("KYC"), one aspect of Columbia's AML compliance system, is a means of verifying a customer's identity, assessing their risk profile, and monitoring their transactions throughout the banking relationship.  (*Id.* ¶ 121.) Specifically, Columbia's KYC process included several mandatory steps to assist it with AML compliance, including due diligence to understand the nature of the customer's business; Enhanced Due Diligence ("EDD") which included heightened scrutiny on account activity for high-risk customers; and a mechanism to file suspicious activity reports with relevant law enforcement authorities and detect and flag unusual patterns or transactions.  (*Id.* ¶ 122.)

Plaintiffs allege that Columbia knew iCap and Chris Christensen very well because of Columbia's KYC process and Ms. Tzekov's efforts to develop a personal

ORDER - 6

relationship with Chris Christensen. (*Id.* ¶ 123.) Ms. Tzekov visited the iCap offices, assisted the Christensens with their daily transactions and transfers, processed physical cash on their behalf, and even sought personal employment with iCap. (*Id.*)

Notwithstanding Ms. Tzekov's relationship with the Christensens, Columbia determined through its KYC process that various iCap Entities were high-risk. (*Id.* ¶ 124.) Between August 24, 2021, and November 21, 2023, Columbia conducted at least 17 EDD reviews and, each time, determined that iCap's risk level was high. (*Id.*) Due to the resulting high-risk classification, Columbia "perform[ed] heightened scrutiny of iCap's account activity[.]" (*Id.* ¶ 125.)

Plaintiffs further allege that Columbia gained extensive insight into the nature of iCap, the identity of its clients, and fact that iCap's fund accounts held investor deposits through reviewing iCap's organizational documents and financial statements as part of its AML compliance activity. (*Id.* ¶¶ 126-127.) Columbia also learned about the nature of iCap as a result of conducting due diligence into Chris Christensen when he applied for a home loan or line of credit and as a result of the open-source research that Columbia ran on various iCap Entities. (*Id.* ¶¶ 128-129.) According to Plaintiffs, it would have been abundantly clear to Columbia that accounts at Columbia held iCap investors' deposits and that the investors "believed [that] they were investing in a legitimate real estate business[.]" (*Id.* ¶ 130; *see also id.* ¶ 131 (alleging that Columbia's internal email communications confirm Columbia's knowledge of the source of funds in the iCap accounts).)

Plaintiffs further assert that Columbia had intimate knowledge of, (*id.* ¶¶ 132-148), and provided substantial assistance to, (*id.* ¶¶ 149-170), the iCap Ponzi Scheme.

### 1. Columbia's Alleged Knowledge of the Ponzi Scheme

According to Plaintiffs, Columbia knew that iCap's business model was not viable based on the cash balance position in iCap's accounts and the net losses of the iCap enterprise. (*Id.* ¶ 136.)

#### a. The iCap Business Model Was Not Viable.

Plaintiffs first allege that iCap's real estate investments did not generate sufficient revenue to satisfy the monthly obligations owed to its investors and real estate lenders. (*Id.* ¶ 135.) Accordingly, iCap's bank accounts at Columbia were "frequently overdrawn and/or carried negative balances." (*Id.*) Columbia periodically contacted the Christensens about the overdrawn accounts. (*See, e.g.*, *id.* ¶ 136 (describing the date and nature of these communications).) When this happened, iCap transferred funds from various accounts—including those accounts that held investors' money—to cover any deficits, overdrafts, and obligations to existing investors. (*Id.*) Columbia also reviewed the tax returns of the iCap Entities and saw that "they were taking huge losses." (*Id.*) Columbia also knew that most of the funds deposited by iCap into its Columbia accounts came from iCap investors, intercompany transfers, and external lenders, "rather than being generated through business operations." (*Id.* ¶ 137.) In addition, Columbia had "direct visibility" into iCap's deposits; investors or other iCap Entities provided 95% of the deposited funds. (*Id.*)

ORDER - 8

Similarly, contrary to iCap's representations to investors, the Christensens did not use the withdrawals from the iCap accounts to fund investments. (*Id*. ¶ 138.) Rather, the Christensens used most withdrawals to pay returns to investors and complete intercompany transfers. (*Id*.) Between October 2018 and July 2023, the Christensens withdrew approximately $585 million from iCap accounts at Columbia. (*Id*.) 75% of transactions during this period were related to returns to investors and intercompany transfers. (*Id*.) Only 20% of transactions during this period were related to real estate projects or to business operations. (*Id*.) Plaintiffs contend that this knowledge was uniquely available to Columbia and thus Columbia knew that iCap Entities were not operating their stated business and, instead, were operating the iCap Ponzi Scheme. (*Id*. ¶ 139.)

### b. iCap's Banking Activities Were "Out of Pattern[.]"

Furthermore, Columbia determined after its own investigation that iCap's banking activities were "out of pattern for an investment firm." (*Id*. ¶ 140.) Specifically, in 2020, Columbia conducted a 90-day review of suspicious activity in iCap's accounts. (*Id*. ¶ 140.) In its investigations record for the period covering July 29, 2020, to December 11, 2020, Columbia noted that there was a $400,000 cash deposit during the review period that matched an outgoing international wire to an individual investor for $100,000. (*Id*.) Columbia determined that this movement of funds was suspicious, and "out of pattern for an investment firm." (*Id*. (emphasis omitted).) The Christensens could not explain the source of the cash deposit. (*Id*.) Accordingly, Plaintiffs contend that

ORDER - 9

Columbia was aware of the iCap Ponzi Scheme based on its knowledge of these inflow and outflow patterns. (*Id.*)

### c. iCap's Tax Losses Were Incompatible with Chris Christensen's Withdrawals.

In 2019, Columbia rejected Chris Christensen's application for a home equity line of credit ("HELOC"). (*Id.* ¶¶ 141-142.) iCap had been reporting losses on its tax returns that were incompatible with Chris Christensen's receipt of funds from iCap. (*Id.* ¶ 141.) Upon receipt of his application for a HELOC, a member of Columbia's underwriting group requested to review full 2018 tax returns for iCap's business and a written explanation from Chris Christensen on how iCap, which showed losses in the millions, provided him a salary and guaranteed payment. (*Id.*) Columbia denied Chris Christensen's HELOC application as a result of its diligence into Chris Christensen's income and business operations. (*Id.* ¶ 142.) Despite these concerns, Columbia did not shut down the iCap Ponzi Scheme. (*Id.*)

### d. Columbia Knew iCap Shuffled and Commingled Investor Monies.

iCap routinely shuffled and commingled investor funds among its accounts at Columbia. (*Id.* ¶ 143.) Plaintiffs allege that such activity is a classic sign of a Ponzi scheme. (*Id.*) Columbia uniquely understood the structure of iCap's various investment funds, had visibility into the inflows and outflows of capital in the iCap accounts, and purportedly knew there could be no valid business purpose for these movements of funds. (*Id.* ¶ 145.) Between October 2018 and July 2023, 91% of deposits into one such fund, called "Fund 1[,]" were "intercompany transfers, the majority of which were received

from iCap Equity, LLC." (*Id.* ¶ 143.) During the same period, the Christensens used 91% of Fund 1's withdrawals to pay iCap investors. (*Id.*) Thus, Plaintiffs assert that Columbia had knowledge that "there was a commingling of funds such that the funds were effectively pooled into one common fund." (*Id.*; *see also id.* ¶ 144 (describing a similar situation for "Fund 2").) Furthermore, Columbia had knowledge of the transfers through Ms. Tzekov's management and oversight of iCap's and the Christensens' accounts. (*Id.* ¶ 145.) For example, on April 5, 2022, Ms. Tzekov emailed iCap about a $20,000 payment to an iCap investor that caused the account to be overdrawn. (*Id.*) In response, an iCap team member emailed the Christensens (copying Ms. Tzekov) requesting a transfer from "Fund 3" to Fund 2 to avoid overdrawing the account. (*Id.*)

> e. *Columbia Knew iCap Entities Transferred Investor Monies into Chris Christensen's Personal Accounts.*

Beginning in 2016, Columbia knew that the Christensens were transferring funds into Chris Christensen's personal account. (*Id.* ¶ 146.) Chris Christensen worked directly with Ms. Tzekov to streamline the process of making the transfers. (*Id.*) Specifically, in 2021, he informed her that he planned to make transfers from iCap accounts to his personal accounts more often and requested a means of completing the transfers more easily, such as a mechanism to do them online. (*Id.*) Furthermore, Columbia knew that Chris Christensen used investor funds to purchase a vacation home. (*Id.* ¶ 147.) Specifically, on January 27, 2016, he transferred $450,000 from an investment fund to the entity that owned his vacation home and then wired almost $470,000 to a title company for the purchase of the property, identifying the borrower as

ORDER - 11

the entity that owned the vacation home.  (*Id.* ¶¶ 104, 147.)  Even though it allegedly knew that Chris Christensen had no legitimate business purpose for transfers of this nature, Columbia intentionally enabled the transfers and did nothing to stop them.  (*Id.* ¶ 148.)

### 2.  Columbia's Alleged Assistance to the iCap Ponzi Scheme

Plaintiffs further allege that Columbia continued to provide substantial assistance to the iCap Ponzi Scheme in several ways despite its knowledge of suspicious and illicit activity.  (*Id.* ¶ 149.)

#### a.  *Columbia Declined to End iCap's Banking Services*

According to Plaintiffs, Columbia wanted to continue generating lucrative banking fees from iCap accounts and thus declined to discontinue its banking relationship with iCap and the Christensens even after it learned of their fraud.  (*Id.* ¶¶ 150, 152.)  Notably, other banks, which were far less familiar with iCap's suspicious transactions and patterns, declined to provide banking services for iCap.  (*Id.* ¶ 151.)  For example, Chase Bank determined that it could not provide sufficient oversight to comply with relevant regulatory requirements and declined to service iCap.  (*Id.*)  Because Columbia prioritized retaining iCap and the Christensens as banking clients, iCap investors suffered hundreds of millions of dollars in losses.  (*Id.*)

#### b.  *Columbia Facilitated Fraudulent Money Transfers.*

Next, Plaintiffs allege that Columbia routinely aided the Christensens with completing fraudulent transfers in part to cover deficits when iCap had insufficient funds in one of its various accounts.  (*Id.* ¶ 153.)  Ms. Tzekov sometimes contacted the

ORDER - 12

Christensens when an account was about to be overdrawn and suggested that they transfer funds to cover the insufficiency. (*Id*. ¶¶ 154-55 (alleging two such examples of this conduct that happened in 2022).) Columbia also aided the Christensens with transferring iCap funds, including investor funds, to their personal accounts. (*Id*. ¶ 156; *see also id*. ¶ 159 (alleging that on January 21, 2022, Columbia transferred $292,125 and $99,000 to Chris Christensen's personal accounts).) Ms. Tzekov explicitly affirmed that Columbia would help Chris Christensen process transfers to his personal account if he told her "when and how much." (*Id*. ¶ 158.) Ms. Tzekov also offered to investigate ways for Chris Christensen to complete the transfers unassisted. (*Id*.)

> ### c.   *Columbia Did Not Further Investigate Red Flags.*

During the banking relationship, Columbia undertook several investigations into suspicious activities on the part of iCap and the Christensens, but "repeatedly failed to escalate those concerns, both internally and externally." (*Id*. ¶ 160.) Plaintiffs allege that Columbia employees completed forms incorrectly to help iCap or Chris Christensen evade scrutiny. (*Id*. ¶¶ 160, 167.) Although Columbia classified iCap as a high-risk customer and completed at least 17 EDD reports on iCap transactions, Columbia did not escalate any concerns to law enforcement or regulatory agencies. (*Id*. ¶¶ 161-62.) Rather, after each report, Columbia decided only to monitor iCap and the Christensens via the bank's internal systems and concluded that there were no AML or BSA related concerns. (*Id*. ¶ 162.) Specifically, Columbia's EDD reports state that "the account activity is in line with the customers normal banking history as a real estate investment

ORDER - 13

business[,]" even though Columbia knew that iCap's activity was neither normal nor in line with the business of a real estate investment firm.  (*Id*.)

In the only detailed investigation it conducted, Columbia concluded in 2020 that certain of iCap's banking activities as "out of pattern for an investment firm."  (*Id*. ¶ 163.)  The 2020 investigation into suspicious transactions is presumably the only time Columbia recommended filing a report with a regulatory agency.  (*Id*.; *see also id*. ¶¶ 164-65 (describing the applicable regulatory reporting scheme).)  Ultimately, however, Columbia did not report the suspicious activity that it detected in 2020.  (*Id*. ¶ 166.)

Furthermore, Plaintiffs allege that Columbia "substantially assisted the Christensens' fraud, misuse, and misappropriation of [] funds throughout their banking relationship" by accepting iCap investor deposits, permitting iCap's commingled accounts to remain open, and continuing to process thousands of transfers and transactions, totaling tens of millions of funds, that moved investor funds between fund accounts and Chris Christensen's personal accounts.  (*Id*. ¶ 168.)  Columbia allegedly did so to generate fees, charges, interest, and other forms of revenue at the expense of iCap investors.  (*Id*. ¶ 169.)

>           d.   *Columbia Knew of and Substantially Assisted the Christensens' Breach of Fiduciary Duties.*

Plaintiffs allege that Columbia knew through its due-diligence efforts that the Christensens "solicited and accepted investments[] and that they owed [the iCap investors] a fiduciary duty to act with the utmost good faith and in the best interest of those [i]nvestors."  (*Id*. ¶ 171.)  Plaintiffs also allege that Columbia knew that the

ORDER - 14

Christensens engaged in illicit transactions and otherwise acted to further the iCap Ponzi Scheme. (*Id*. ¶ 172.) Nevertheless, rather than report iCap's Ponzi Scheme to the proper authorities, Columbia substantially assisted the Christensens with perpetrating the scheme and breaching their fiduciary duties to the iCap investors. (*Id*.)

**D.    Procedural History**

On September 26, 2025, Plaintiffs commenced this action, asserting claims for (1) aiding and abetting fraud, and (2) aiding and abetting breach of fiduciary duty. (*Id*. ¶¶ 173-187.) On December 30, 2025, Columbia moved to dismiss the complaint asserting that: (1) Plaintiffs have not established standing to bring claims on behalf of all iCap investors; (2) Plaintiffs fail to state a claim on behalf of unnamed iCap investors who assigned their claims to the Trust; (3) Plaintiffs fail to state a claim for aiding and abetting fraud; and (4) Plaintiffs fail to state a claim for aiding and abetting breach of fiduciary duty. (*See generally* MTD.) The motion is now fully briefed and ripe for decision.

## III.    ANALYSIS

The court considers each of Columbia's requests for dismissal in turn.

**A.    Columbia's Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Rule 12(b)(1) is Denied.**

Under Federal Rule of Civil Procedure 12(b)(1), a party may seek dismissal of an action for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The case or controversy requirement under Article III of the U.S. Constitution "limits federal courts' subject matter jurisdiction by requiring, inter alia, that plaintiffs have standing and that

ORDER - 15

claims be ripe for adjudication." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121 (9th Cir. 2010) (internal quotation marks and citation omitted). "Standing addresses whether the plaintiff is the proper party to bring the matter to the court for adjudication." *Id*. at 1122 (citation omitted). The Supreme Court has held that assignees of a cause of action have standing to sue to redress assignors' injuries and that historical practice permits such representative suits. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 285-88 (2008) ("[W]ithin the past decade we have expressly held that an assignee can sue based on his assignor's injuries.").

Columbia first attacks the complaint by asserting that Plaintiffs lack standing to bring claims on behalf of those investors who have not assigned their claims to the Trust. (MTD at 5-6. [5]) Plaintiffs do not contest that they may not automatically sue on behalf of non-assigning investors. (Resp. at 12 n.6.) Because the complaint "does not seek to pursue claims or damages on behalf of [i]nvestors that have not assigned their claims to the Trust[,]" the court denies Columbia's motion to dismiss this action for lack of standing. (*Id*.)

**B.      Columbia's Motion to Dismiss for Failure to State a Claim is Denied.**

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when a complaint "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6); *see*

---

[5] Columbia does not, however dispute that Plaintiffs have standing as assignees on behalf of iCap investors who previously assigned their claims to the Trust, either according to the liquidation plan created by the Bankruptcy Court in October 2024 (the "Plan") or subsequently through another means. (*See* MTD at 3; Reply at 3-4 ("Columbia takes no position about whether investors may, *in the future*, assign any claims to the Trust[.]") (emphasis in original).)

ORDER - 16

*also* Fed R. Civ. P. 8(a)(2) (requiring that the plaintiff provide "a short and plain statement of the claim showing that the pleader is entitled to relief").  Under this standard, the court construes the allegations in the complaint in the light most favorable to the nonmoving party, *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005), and asks whether the claim contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).  "At the motion to dismiss phase, the trial court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff." *In re Tracht Gut*, 836 F.3d at 1150 (citation omitted).

Federal Rule of Civil Procedure 9(b) heightens the pleading requirements for all claims that "sound in fraud" or are "grounded in fraud." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (citation omitted); Fed. R. Civ. P. 9(b).  To satisfy Rule 9(b), "allegations of fraud must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'" *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)).  "Averments of fraud must be accompanied by

'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation omitted).

        1.  <u>Plaintiffs need not identify in their complaint the iCap investors who assigned their claims to the Trust.</u>

Columbia asserts that Plaintiffs inadequately pleaded their claims because the complaint does not name the assigning investors and thus does not comport with Rule 9(b). (MTD at 6-7.) In response, Plaintiffs contend that this level of detail is not required at the pleading stage; rather, they argue that "the identity of (and details related to) assignors of Ponzi scheme damage claims are properly obtained through the discovery process[.]" (Resp. at 13.) The court agrees with Plaintiffs.

Columbia relies on two district court cases to support its argument that Plaintiffs must plead the details of each fraudulent transaction for each individual investor harmed by a Ponzi scheme: *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C09-1115 SI, 2009 WL 4874872, at *4 (N.D. Cal. Oct. 6, 2009) ("*TFT-LCD*") and *Zazzali v. Eide Bailly LLP*, No. 1:12-CV-349-S-MJP, 2013 WL 6045978, at *35 (D. Idaho Nov. 14, 2013). (MTD at 6-7; Resp. at 12-16.) The court, however, agrees with Plaintiffs that this case is more similar to *Miller v. Union Cent. Life Ins. Co.*, No. 2:14-cv-00575JNP-PMW, 2016 WL 2766636, at *2-4 (D. Utah May 12, 2016). (Resp.at 13.) In *Miller*, the trustee of a trust sued on behalf of 430 individual victims of a Ponzi scheme who had assigned their claims to the trust. *Id.* at *1. The district court denied the defendant's motion to dismiss for failure to identify the individual assignors, reasoning that "[t]he number of victims would make it impractical . . . to set forth the names, times, and places" relevant to the

ORDER - 18

scheme, and that the complaint included sufficient information for the case to proceed absent the identities of the assignors. *Id.* at *2 (emphasis omitted). The district court further observed, however, that the plaintiffs would be required to identify the names of the victims and the dates and places of the fraudulent transactions during discovery. *Id.* Later, consistent with this ruling, the magistrate judge granted the defendant's request for discovery about the identity of the assignors and the basis of their claims. *Id.*

Here, as in *Miller*, Plaintiffs need not include the identity and other details about the assignors in their complaint because: (1) the scheme is complex and spans a dozen years, and the number of victims makes it impractical to set forth the details of each instance of fraud in the complaint; and (2) Columbia can obtain that information through the discovery process. The court determines that, even absent information about the identities of the assigning investors, the complaint satisfies the heightened pleading standard of Rule 9(b) because it states with particularity the "who, what, when, where, and how" of the misconduct alleged. *Vess*, 317 F.3d at 1106. Specifically, the complaint states that over the course of a 13-year banking relationship, Columbia knew of iCap and the Christensens' suspicious and illicit banking activity but failed to stop or further investigate that activity. (*See generally* Compl.) Plaintiffs further allege that between 2013 and 2023, with Columbia's assistance and knowledge, the Christensens "stole or otherwise squandered approximately $230 million obtained from over 1,800 investors in the United States and abroad" by inducing them to invest in a sham real estate business that provided little or no return. (Compl. ¶ 8.) Plaintiffs represent that, as of the date they filed their response, 959 former iCap investors asserting over $153 million in losses

ORDER - 19

have assigned their claims to the Trust. (Resp. at 1 n 2.) Accordingly, the court denies Columbia's motion to dismiss for failure to identify the assignors in the complaint.

2. Plaintiffs state a claim for aiding and abetting fraud.

Columbia next asserts that the court must dismiss Plaintiffs' claim for aiding and abetting fraud because Plaintiffs have not adequately alleged iCap's primary liability for fraud, Columbia's actual knowledge of the iCap Ponzi Scheme, or Columbia's substantial assistance to the scheme. (MTD at 7-17.) In response, Plaintiffs clarify that they are pursuing a claim of aiding and abetting liability under the second prong of Restatement (Second) of Torts § 876—that is, they allege that Columbia knew of the Christensens' tortious conduct and substantially assisted or encouraged their fraud. (Resp. at 24-25.)

Washington courts use a test articulated in the Restatement (Second) of Torts to determine whether a plaintiff has stated a claim against a particular defendant for aiding and abetting a second defendant who engaged in tortious conduct:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>    (a) does a tortious act in concert with another or pursuant to a common design with him; or
>    (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself; or
>    (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (1979) (cited with approval in *Martin v. Abbott Lab'ys*, 689 P.2d 368, 378 (Wash. 1984)). Thus, "to plead a claim for aiding and abetting[,] a plaintiff must allege (i) the existence of a violation by the primary

ORDER - 20

wrongdoer; (ii) knowledge of this violation by the aider and abettor; and (iii) that the aider and abettor substantially assisted in the primary wrong." *In re Consol. Meridian Funds*, 485 B.R. 604, 615-16 (Bankr. W.D. Wash. 2013) (interpreting Washington law). Furthermore, Plaintiffs must plead fraud with sufficient particularity to satisfy the requirements of Rule 9(b). *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007).

> a. *Existence of a violation by the primary wrongdoer*

Aiding and abetting liability depends on the establishment of primary liability against another party for the primary tort. Restatement (Second) of Torts § 876 (1979); *see also Brashkis v. Hyperion Cap. Grp., LLC*, No. C11-05635RBL, 2011 WL 6130787, at *3 (W.D. Wash. Dec. 8, 2011) ("The aiding and abetting claim cannot proceed when the fraud claim does not."). To state a claim for common-law fraud in Washington, a plaintiff must allege "(1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff." *Adams v. King Cnty.*, 192 P.3d 891, 902 (Wash. 2008) (citation omitted). The parties agree that a Ponzi scheme is a form of fraud. (MTD at 8; Resp. at 17.)

Columbia avers that Plaintiffs' claim fails because they have not sufficiently alleged that iCap is a Ponzi scheme. (MTD at 9-10.) The Ninth Circuit defines a Ponzi scheme as

an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected.   The fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit making [sic] business opportunity exists, where in fact no such opportunity exists.

*In re Agric. Rsch. & Tech. Grp., Inc.*, 916 F.2d 528, 531 (9th Cir. 1990) (citation omitted).

Specifically, Columbia asserts that iCap did not make "*misrepresentations* to investors that the business venture was profitable (when it was not) and [] use[] new investor money to portray the business as profitable."  (MTD at 9 (emphasis in original).)  Contrary to Columbia's assertion, however, Plaintiffs have pleaded facts sufficient to show the existence of the iCap Ponzi Scheme consistent with the Ninth Circuit's definition.  Plaintiffs allege that prior to the current proceedings "the Bankruptcy Court found that the iCap Entities operated as a Ponzi scheme beginning no later than October 2018 through July 2023[.]"  (Compl. ¶¶ 97-98.)  Specifically, the Bankruptcy Court found that

  a.  [the Christensens] operated the iCap enterprise as a Ponzi scheme raising approximately $230 million from over 1,800 investors in the United States and abroad;
  b.  the Ponzi scheme involved the use of funds provided by new investors to the iCap enterprise to make payments to already-existing investors and other creditors; and
  c.  the iCap enterprise did not operate as a legitimate profit-making business.

(*Id*. ¶ 99; *see also* Confirmation Order.)  On this basis, the court concludes that Plaintiffs have plausibly alleged that iCap engaged in the primary tort of fraud.

ORDER - 22

### b. Columbia's knowledge of the violation

Columbia next argues that Plaintiffs' claims fail because they do not sufficiently allege that Columbia had actual knowledge of any alleged Ponzi scheme. (MTD at 10.) In response, Plaintiffs make three arguments concerning the elements of actual knowledge: (1) that actual knowledge can be generally averred under FRCP 9(b); (2) that actual knowledge may be inferred and proven by circumstantial evidence; and (3) that the actual knowledge requirement may be satisfied by showing Columbia's "conscious avoidance" because Columbia "suspected a fact and realized its probability, but refrained from confirming later in order to be able to deny knowledge." (Resp. at 21 (citing *In re Mastro*, No. C9-16841MLB, 2017 WL 2889659, at *16 (Bankr. W.D. Wash. July 6, 2017).)

This court agrees, in pertinent part, that actual knowledge may be averred generally under Rule 9(b); pleading actual knowledge, however, is still subject to the requirement that a plaintiff must state "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 662; *see also* Fed. R. Civ. P. 9(b) ("[K]nowledge . . . may be alleged generally."). Moreover, the plaintiff must allege that the defendant had actual knowledge of the primary violation. *See Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1119 (C.D. Cal. 2003). Although actual knowledge may be inferred and proven by circumstantial evidence, allegations of the same must still satisfy the pleading requirements set forth in *Twombly* and *Iqbal*. *Sloan v. Thompson*, 115 P.3d 1009, 1014 (Wash. 2005).

ORDER - 23

Here, the court concludes that Plaintiffs have alleged facts generally averring that Columbia had actual knowledge of the Christensens' and iCap's fraud. These facts include the results of Columbia's KYC and customer monitoring programs (Compl. ¶¶ 106-131); Columbia's determination that iCap was high risk and its decision to conduct at least 17 EDD reviews during the banking relationship (*id.* ¶¶ 124-25); Columbia's review of iCap's organizational documents, financial statements, and tax records, which outlined the nature of iCap's business and showed that the iCap bank accounts held investors' monies which the Christensens used for real estate investments (*id.* ¶¶ 126-131); and Columbia's knowledge that iCap shuffled and commingled investor monies and transferred investor monies to Chris Christensen's personal accounts (*id.* ¶¶ 143-45). On these bases, the court concludes that Plaintiffs have plausibly alleged that Columbia had actual knowledge of the iCap Ponzi Scheme.

> c. *Columbia's assistance in the primary wrong*

Finally, Columbia asserts that Plaintiffs inadequately pleaded that Columbia substantially assisted with the underlying fraud because their allegations either fall short of Rule 9(b)'s requirement for particularity or describe routine banking transactions. (MTD at 15-17.) Again, the court disagrees.

Restatement (Second) of Torts § 876, which the Washington Supreme Court adopted in *Martin*, requires a showing that a defendant acted jointly with a tortfeasor to produce the harm. *Martin*, 689 P.2d at 378. Although no published Washington decision defines "substantial assistance" by a bank in the context of a Ponzi scheme, Washington courts have clarified that assistance necessary to establish aiding and abetting liability

ORDER - 24

must be more than the "expression of an opinion" on which the tortfeasor may have relied, *Cain v. Dougherty*, 341 P.2d 879, 882 (Wash. 1959), and that under certain circumstances those entities providing professional services, such as law firms, may be liable for aiding and abetting fraud, *Aggen v. Graham & Dunn, P.C.*, No. 122250588, 2014 WL 5477920, at *9 (Wash. Super. July 03, 2014). Relatedly, courts in this District presented with this question have held that:

> [a] bank that performs routine banking transactions for a customer can be held liable for aiding and abetting that customer to commit a tort, if the bank knew that the routine transactions were part of a scheme to injure a third party[.]

*Villalobos v. Deutsche Bank Nat'l Tr. Co.*, No. C09-1450JCC, 2011 WL 13232599, at *4 (W.D. Wash. May 3, 2011) (citing *In re First All. Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006) ("[The] ordinary business transactions a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort.").

Viewing the complaint in a light most favorable to Plaintiffs, the court concludes that Plaintiffs sufficiently allege that Columbia substantially assisted with the underlying fraud. As discussed above, Plaintiffs plausibly allege Columbia's actual knowledge of the iCap Ponzi Scheme. (*See supra* at 7.) Plaintiffs further allege that Columbia substantially assisted in that scheme by facilitating fraudulent money transfers; failing to investigate banking activity that it deemed risky and suspicious; and failing to terminate banking services to iCap. (*See* Resp. at 9, 24.) The court further determines that these allegations satisfy Rule 9(b). The complaint sets forth the nature of and dates of

ORDER - 25

operation of the iCap Ponzi Scheme and describes: (1) Columbia's assistance with fraudulent money transfers that led, in part, to Columbia's determination that iCap's banking activities were "out of pattern for an investment firm[;]" (2) the diversion of iCap funds to the Christensens for personal use; and (3) 17 investigations by Columbia into iCap's suspicious banking activity that ultimately did not result in termination of the banking relationship. (*See* Compl. ¶¶ 97-99, 150-70; *see also* Confirmation Order.) On this basis, the court concludes that Plaintiffs have sufficiently alleged that Columbia substantially assisted the iCap Ponzi Scheme. As a result, the court concludes that Plaintiffs state a claim for aiding and abetting fraud and denies Columbia's motion to dismiss this claim.

> 3.   Plaintiffs state a claim for aiding and abetting breach of fiduciary duty.

Finally, the court also concludes that Plaintiffs state a claim for aiding and abetting the Christensens' breach of fiduciary duty. To state a claim for breach of fiduciary duty, a plaintiff must allege: (1) the existence of a duty owed; (2) a breach of that duty; (3) resulting injury; and (4) that the claimed breach proximately caused the injury. *Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP*, 40 P.3d 1206, 1217-18 (Wash. 2002).

The parties do not dispute that the Christensens breached their fiduciary duties to the iCap investors. (*See generally* MTD; Resp.; *see also* Compl. ¶¶ 126-27, 130-31, 171, 180-81.) Rather, Columbia contends that Plaintiffs have inadequately pleaded that it had knowledge of any fiduciary duty or provided substantial assistance to the Christensens' violation. (MTD at 20-22.)

### a. Columbia's knowledge of the violation

Columbia first asserts that Plaintiffs fail to state a claim for aiding and abetting breach of fiduciary duty because they insufficiently allege that Columbia knew of a direct relationship between the Christensens and the investors or of any fiduciary duty. (*Id.* at 20.) As discussed earlier, however, Plaintiffs have plausibly alleged that, Columbia had knowledge of the nature of the Christensens' business, source of the deposited funds, and fiduciary duties as a result of its KYC process, EDD reviews, and review of iCap documents. (*See supra* at 7; *see also* Compl. ¶¶ 116-122 (KYC monitoring); ¶¶ 124-25 (EDD reviews); ¶¶ 126-31 (review of iCap documents and fiduciary duties to investors).) Thus, the court concludes that Plaintiffs have sufficiently alleged Columbia knew of the Christensens' fiduciary duties and breaches thereof.

### b. Columbia's assistance in the primary wrong

The court similarly concludes that Plaintiffs have sufficiently alleged that Columbia substantially assisted the Christensens' breach of fiduciary duties. The parties' arguments regarding substantial assistance to the Christensens' breach of fiduciary duty are nearly identical to the arguments they made with respect to aiding and abetting fraud. (MTD at 21-22; Resp. at 24-25.) Columbia's banking services amount to substantial assistance because Columbia allegedly processed several fraudulent money transfers, permitted the diversion of iCap's funds to the Christensens for personal use, and maintained the banking relationship despite conducting 17 investigations into suspicious banking activity. (Compl. ¶¶ 150-170.) The court concludes that Plaintiffs have sufficiently alleged that Columbia substantially assisted the Christensens' breach of

fiduciary duty. Because Plaintiffs state a claim for aiding and abetting breach of fiduciary duty, the court denies Columbia's motion to dismiss this claim.

### IV.   CONCLUSION

For the foregoing reasons, the court DENIES Columbia's motion to dismiss (Dkt. # 23).

Dated this  9th day of June, 2026.

JAMES L. ROBART
United States District Judge

ORDER - 28